UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE BRISTOL-MYERS SQUIBB    :
SECURITIES LITIGATION          :     Civil Action No. 00-1990 (SRC)
                               :
                               :     M E M O R A N D U M
                               :     O P I N I O N

**HUGHES, U.S.M.J.**

This matter comes before the Court upon Motion by Lead Plaintiff, the Long View Collective Investment Fund ("Plaintiff"), for leave to file a Third Amended Class Action Complaint. By way of background, Plaintiff originally sought to include certain newly-identified statements ("the statements") in the "Contested Facts" section of the Joint Final Pretrial Order ("FPO"). Defendants, Bristol-Myers Squibb Company ("BMS") and individual Defendants Peter R. Dolan, Charles A. Heimbold, Jr. and Peter S. Ringrose (collectively "Defendants") opposed that proposal and the request was denied. Plaintiff subsequently filed the instant Motion for leave to amend the Complaint and Defendants submitted formal opposition to the Motion. The Court has reviewed the papers submitted by the parties and has decided the matter pursuant to FED. R. CIV. P. 78. For the reasons stated below, Plaintiff's Motion to amend the Complaint is denied.

**I.     BACKGROUND AND PROCEDURAL HISTORY**

In April of 2000, several class actions were filed against Bristol-Myers Squibb and its officers, alleging violations of federal securities law and state common law. The District Court consolidated the actions and appointed a Lead Plaintiff on July 24, 2000. A Consolidated Class Action Complaint was filed against Bristol-Myers Squibb, Heimbold and Ringrose and on March 8, 2001, after Defendants filed a motion to dismiss various claims, the Court upheld certain of

Plaintiff's federal securities claims.

Subsequent to that Opinion, the District Court certified a class of all persons who purchased Bristol-Myers Squibb common stock during the time period spanning from November 8, 1999 through April 19, 2000 ("initial class period"). Following class certification, Plaintiffs were granted leave to file an Amended Complaint ("First Amended Complaint") on or about May 15, 2002. This Complaint added allegations against Defendant Dolan, who had previously not been an individually named party to the case. Defendants were granted until October 21, 2002 to answer the First Amended Complaint. An Amended Answer was filed on or about November 13, 2002. On or about April 29, 2002, Defendants moved for Partial Judgment on the Pleadings, and on June 6, 2003, Plaintiff cross-moved for Leave to File a Second Amended Complaint.

In its proposed Second Amended Complaint, Plaintiff alleged violations of Section 10(b) of the 1934 Securities Exchange Act and Rule 10(b)(5) by all Defendants, as well as violations of 20(a) of the Exchange Act against Defendants Heimbold and Dolan. Additionally, on July 2, 2004, a Stipulation and Order was entered by the Court certifying a class of all persons who purchased Bristol-Myers Squibb common stock during the time period spanning from March 22, 2001 through March 20, 2002 ("second class period"). On August 19, 2004, the Court issued an Opinion granting and denying in part, Defendants' Motion for Partial Judgment on the Pleadings and Plaintiff's Cross-Motions for leave to file a Second Amended Complaint.

Fact discovery in this matter closed on April 15, 2004, with the parties having engaged in wide-ranging fact discovery. Nearly four million pages of documents have been produced and a total of forty-four fact witnesses have been deposed. Additionally, the parties have submitted reports from twenty-six experts, and are currently conducting expert depositions. The parties

have submitted a Proposed Final Pretrial Order and the Final Pretrial Conference began, but was aborted on December 15, 2004, due to the referencing of new statements here in issue. Finally, Defendants' summary judgment motion was filed December 30, 2004 and is presently pending before the District Judge, together with various challenges to expert witnesses based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Briefly, the present Motion arises out of Plaintiff's efforts to include certain statements in the "Contested Facts" section of the proposed Joint Final Pretrial Order. That bid was denied and the issue now before this Court is whether these additional statements can be included as claims in an Amended Complaint and thereby be included in the Final Pretrial Order. Contrary to Plaintiff's assertion, the Court did not "order[] that Lead Plaintiff file this motion." *See* Pl. ['s] Br. at 1. Rather, the Court simply denied Plaintiff's immediate request to insert the new statements and noted that they were entitled to make a formal motion. Thereafter, a motion was filed and the issue fully briefed by the parties.

The statements, or newly-identified factual contentions, in dispute are contained in Plaintiff's "Contested Facts" section IV A (2) of the Proposed Final Pretrial Order submitted to the Court on December 14, 2004. Specifically, Plaintiff seeks to include the following:

> The following representations of existing or historical facts made publicly by defendants BMS, Heimbold, Dolan, Ringrose and/or their agents on the dates indicated were false and/or misleading made:
>
> November 8, 1999 (72nd Annual Scientific Session of the American Heart Association.
>
> Weber: "Just a quick look at safety and tolerability data. And there were no surprises here, and I'm not going to take up any real time

3

looking at it."

Weber: "And angioedema has been an issue with other drugs with ACE inhibition. There have been a lot of patients, as I mentioned earlier, who have already been exposed to Omapatrilat, including at this point over a thousand black patients, and the overall incidence of angioedema is .46 percent in the overall group, and 1.9 percent in black patients. There have been four patients who have had some airway compromise, that required some form of hospitalization or special treatment. There have been no deaths, and all patients have recovered completely. And just for comparison, these are experiences with benazepril, enalapril and lisinopril, three well known ACE inhibitors, showing that their incidence of angioedema is very similar to what we have found with omapatrilat, and given the closeness with which we are looking for these kinds of side effects, this would be very reassuring to me that there is, in fact, no difference."

Weber: "So, if I had to summarize what we've learned, so far, from our phase II and phase III studies, we find that the side effect profile is really very comparable to other ACE inhibitors; if we look at headache, if we look at cough. We already pointed out the obvious, you get more peripheral edema with amlodipine. There is no difference, again, no surprise here, between omapatrilat and placebo." And, "[s]o we have a drug, Mr. Chairman, that has a unique mechanism of action that seems to translate into true clinical benefits. And it seems to be a safe and well tolerated drug with a profile very similar to current antihypertensive agents."

Weber slides: (i) "Patients With Mild-to-Moderate Hypertension," including "Safe and well tolerated with fewer discontinuations compared with amlodipine;" (ii) "Omapatrilat Clinical Safety and Tolerability: Phase II/III Summary;" (iii) "Incidence of Angiodema;" and (iv) "Omapatrilat: Clinical Summary," including "Safe and well tolerated, safety profile similar to current antihypertensive agents."

Weber: "Omapatrilat is safe and well tolerated, and adverse events are comparable to currently available antihypertensive agents" and with respect to omapatrilat's clinical summary "Excellent safety, tolerability comparable to current antihypertensives."

Pouleur's slides: "Incidence of Angioedema in Controlled Studies" and "Omapatrilat: Clinical Summary," including "Safe and well

4

tolerated with safety profile similar to current antihypertensive agents."

November 8, 1999 (BMS media interview)
and November 9, 1999 (conference call with analysts)

Pouleur: "In terms of skew, it's clear that most of the cases are extremely mild and are limited to first use.  If you compare the incidence of angioedema that we have for 6000 patients, it's very similar to the incidence about observing the salt, for example, as an option and if you obtain that by the [FOI] the [inaudible] occasion that the database of other agents [inaudible] is about the same incidence."

Pouleur: "plus all the evidence about the incidence of angioedema was good in the African-American population."

Pouleur: "And looking at the numbers, it's exactly the same as with ACE inhibitors that fits with the experience."


March 10, 2000 (Presentations at BMS sponsored symposium)

Black slides: (i) "safety profile of omapatrilat is comparable to other antihypertensive drugs;" (ii) "Overall incidence regardless of severity about 0.5% in nonblacks and 2.1% in blacks;" "4 cases of airway compromise - all recovered;" "Incidence similar to ACE inhibitors;" and (iii) "Safety profile comparable to other antihypertensive drugs."


March 11, 2000 (Presentation at Association of Black Cardiologists

Ferdinand slides: "Overall incidence regardless of severity about 0.5% in non-blacks and 2.1% in blacks;" "4 cases of airway compromise – all recovered;" and "Incidence similar to ACE inhibitors."


April 13, 2000 (Financial Times interview)

"Mr. Heimbold was optimistic about prospects for the company's drug Vanlev, which combats high blood pressure and is expected to do well.  He hoped Vanlev would be launched in June in the US -

implying swift approval by the US Food and Drug Administration. He believed its peak annual sales could be more than $3bn, at the top end of analysts' estimates." ... "It [Vanlev] will be the biggest product we've ever introduced. ... It's initial take-off won't be as dramatic as some of the others but it will ultimately be the biggest."

November 7, 2001

Dolan: "We are clearly optimistic because we believe we have supportive data on Vanlev and that's why we made the decision to refile....But in the immediate term those that we think will have the biggest impact on our revenue growth rates would be potentially Vanlev and aripiprazole."

Dolan: "I'm going to let you draw your own conclusions from the words that we very carefully chose. And to get to you once again that we made the decision on the basis of a handful of us who had access to the data, finding it to be supportive of our decision to refile by the end of the year."

Seidenberg: "I would like to spend some time on the OCTAVE study .... Let me take a moment up front to explain why we can't share OCTAVE results yet. Earlier this year, we announced that pending supportive results from the OCTAVE study, we expected to reach a decision on the re-filing of the NDA for Vanlev in hypertension in September or October. In September, we announced, we announced that after thorough review and analysis of the OCTAVE results, we would proceed with resubmitting an NDA before the end of this year. These plans are right on track. In order to preserve the integrity of the NDA review process, we do not intend to publicly disclose OCTAVE data until the FDA has completed its review process" and showed a slide depicting Vanlev as the next drug in the cardiovascular pipeline. . . . "I will now turn to the OCTAVE trial, which underscores our commitment to this promising compound."

Seidenberg: in the Phase II heart failure trial IMPRESS, "rates of death or hospitalization due to heart failure were lower for patients taking Vanlev. The overall relative risk reduction with Vanlev was 47%."

Seidenberg: "We remain confident in its potential in both hypertension and congestive heart failure" and the slide summarizing

this statement."

December 13, 2001 (BMS press release and conference call with analysts)

Dolan: "On one pipe-line product that all of you've been asking us about for several quarters, Vanlev, here's an update. We will refile Vanlev with the FDA tomorrow, December 14. We are very pleased to hit our deadline of an 01 filing, a commitment we made to all of you some time ago ... and based on the promise of these three we've now budgeted for $200 million dollars in advertising and promotion spending in 02 to prepare the market, support our representatives and launch new products. That investment supports our commitment to you and the patient that we feel strongly we have blockbuster drugs coming."

January 24, 2002 (BMS conference call with analysts)

Dolan: "Later in the year following review by the FDA the data from the Octave study comparing Vanlev to Enalapril will be available. We remain fully committed to this important advance in the treatment of hypertension."

### A.  Plaintiff's Motion to Amend the Complaint

In this matter, Plaintiff first sought to include the above-referenced statements in the "Contested Facts" section of the Joint Final Pretrial Order. That attempt was denied and Plaintiff subsequently filed the instant Motion. Plaintiff contends that it should be permitted to amend its Complaint because "the rationale for the so-called 'gatekeeping' function of the PSLRA's heightened pleading standards is inapplicable here, where Plaintiff's current [C]omplaint has already survived *two* challenges, fact discovery is complete and expert discovery will conclude in a matter of weeks." Pl. ['s] Br. at 1. (emphasis original). Furthermore, Plaintiff contends that "[e]ven if the Court determines that the PSLRA's heightened pleading standards are relevant here, Third Circuit case law provides for liberal amendment of the pleadings in securities fraud

7

cases." *Id.* Plaintiff further contends that it should be permitted to include these statements since

> "nearly all of the 19 statements Lead Plaintiff seeks to add were made by the same speaker on the same day at the same event and involve the same misrepresentations as the 20 statements that have been twice upheld by the Court. Accordingly there is a direct relationship between the 20 statements already deemed actionable by the Court and most of the 19 additional statements that are at issue here."

*Id.* at 2. Additionally, Plaintiff states that its "proposed amendments will not prejudice Defendants. Each of the statements comes directly from documents produced by Defendants in this action, were addressed at depositions and/or were set forth almost nine months ago in Lead Plaintiff's response to contention interrogatories." *Id*. Furthermore, Plaintiff claims that the "additional statements [it] seeks to add will not delay the proceedings in this case, nor is Lead Plaintiff's request for leave made in bad faith or with dilatory motive." *Id.*

In essence, Plaintiff argues that the proposed Amended Complaint "seeks to conform the [C]omplaint with the evidence obtained to date simply by adding additional factual information gathered during discovery, most of which relates only to the subsequent class period." *Id.* at 2-3. Plaintiff endeavors to bolster this argument by stating that "[a]s the Court will recall, at the time Lead Plaintiff filed its proposed Second Amended Complaint, Defendants had not completed their production of documents related to the second class period, and no depositions had been taken." *Id.* at 3.

### B. Defendants' Opposition

In response, Defendants first note that their "expert proof and their motion for summary judgment are predicated on the fact that [at present]16 statements are the only actionable statements remaining in the case." Defs.['s] Br. at 2. Additionally, Defendants argue that in its

8

Memorandum " [L]ead [P]laintiff adds language to some statements that does not appear in the Proposed Complaint and omits language that does appear in the Proposed Complaint, while conflating some statements and confusing others." *Id.* at 4.  Specifically, Defendants assert that Plaintiff

> "fails to mention other significant changes and additional claims it seeks to make in the Proposed Complaint.  Lead [P]laintiff neglects to mention that it is trying once again to assert section 10(b) claims against individual [D]efendant Heimbold by challenging two statements attributed to him, notwithstanding the dismissal of all such claims in the prior opinions of Judges Brown and Chesler.  Lead [P]laintiff also fails to mention that it is seeking to add new insider trading claims against Mr. Heimbold, based on stock sales allegedly made before the beginning of the first class period, and against Messrs. Heimbold and Dolan, based on the fact that they allegedly made gifts of stock.  Lead [P]laintiff also neglects to mention that it is seeking to merge into one expanded class period the two noncontiguous certified class periods in this case to include statements that are currently outside those periods."

*Id.* at 4-5.  (internal citations omitted).

Additionally, Defendants argue that "[a]dding a plethora of new statements will require additional fact discovery, development of additional expert proof and, ultimately, a new round of expanded summary judgment papers." *Id.* at 5.  Moreover, Defendants add that

> "[L]ead [P]laintiff has had multiple opportunities to amend the [C]omplaint and has failed to include any of the New Statements, even though it plainly could have done so.  Indeed, [L]ead [P]laintiff admits that 'nearly all' of the New Statements were made at the same event as statements that were included in the Second, Third, and Fourth Complaints[1], and it does not – and could

---

[1] While Plaintiff refers to a Proposed Third Amended Complaint, Defendants contend that the Proposed Complaint is actually Plaintiff's fifth Complaint.  Defendants state: "In April 2000, [P]laintiffs filed a [C]omplaint (the "First Complaint"); on August 21, 2000, [L]ead [P]laintiff filed a Consolidated Class Action Complaint (the "Second Complaint"); on May 14, 2002, [L]ead [P]laintiff filed the First Amended Consolidated Class Action Complaint (the "Third Complaint"); and on June 6, 2003, [L]ead [P]laintiff submitted its Proposed Second

not – explain why its prior complaints omitted those statements."

*Id*. Defendants contend that "[t]he timing of the proposed amendment and [L]ead [P]laintiff's misrepresentations about its contents also suggest, at a minimum, dilatory motive. *Id.* at 6. Defendants argue that

> "[i]f [L]ead [P]laintiff is permitted to file its Proposed Complaint, Defendants would have to examine carefully the new claims, fact and expert discovery would have to be re-opened so that Defendants could defend themselves against the new allegations, class certification would have to be revisited in light of [L]ead [P]laintiff's attempt to expand and merge the class periods, Defendants would have to bring new dispositive motions to address the new claims and take into account the new discovery, and the [Proposed Final Pretrial Order] would have to be completely redone."

*Id*. Defendants make clear in their Brief that they "do not here address the futility of the proposed amendment." *Id.* Rather, they assert a "reserve[d] right to examine the Proposed Complaint under the PSLRA's heightened pleading requirements and to move to dismiss that [C]omplaint if the Court were to grant [L]ead [P]laintiff leave to file it." *Id.* In sum, Defendants ask the Court "to deny [L]ead [P]laintiff leave to amend on the grounds of prejudice and/or undue delay alone." *Id.*

### C.   Plaintiff's Reply

In its Reply Brief, Plaintiff argues that Defendants "do not even challenge the now undisputed fact that nearly all of the 19 statements Lead Plaintiff seeks to add were made by the

---

Amended Consolidated Class Action Complaint (the "Fourth Complaint") with its cross-motion for leave to file that complaint. As [L]ead [P]laintiff was denied leave to file the Fourth Complaint with regard to all but one additional challenged statement, and [L]ead [P]laintiff never filed with the Court a complaint with that additional statement, the last filed complaint in this case is still the Third Complaint." (Defs.['s] Br. at 1, n. 1)

same speaker on the same day at the same event and involved the same misrepresentations as the 20 statements that have been upheld by the Court." Pl.['s] Reply Br. at 1.  Plaintiff asserts that "Defendants raise only two substantive arguments: undue delay and undue prejudice.  However, Lead Plaintiff has not unduly delayed in seeking to amend its complaint." *Id.*  It is the position of Plaintiff that any delay "was occasioned by the Court's need to resolve several complex motions, including Defendants' motion for partial judgment on the pleadings, which was not ultimately decided until August 30, 2004." *Id.*  Additionally, Plaintiff reiterates that "many of the additional statements the Third Amended Complaint seeks to add were derived from documents and other sources that Defendants did not produce until approximately the same time that Lead Plaintiff filed its June 2003 motion to amend, or until significantly later." *Id.*  Turning to the issue of prejudice, Plaintiff argues that "the mere fact that summary judgment has been filed does not give rise to undue prejudice, particularly since the proposed amendments do not necessitate additional fact or expert discovery." *Id.* at 2.  Finally, Plaintiff dismisses Defendants' "other miscellaneous complaints" as "red-herrings that either mischaracterize [its] amendments or highlight inadvertent, minor errors in the proposed complaint." *Id.*

II.     **DISCUSSION AND ANALYSIS**

      A.     **Leave to Amend the Pleadings/Prejudice and Undue Delay**

It has been the accepted and encouraged policy that courts should liberally grant leave to amend pleadings, when justice so requires. FED. R. CIV. P. 15(a); *see also Dole v. Arco Chem. Co.,* 921 F.2d 484 (3d Cir. 1990).  The determination of a motion to amend falls within the discretion of the trial court and is guided by Rule 15(a).  *Foman v. Davis,* 371 U.S. 178, 182 (1962).  Therefore, when the movant's request to amend is "a proper subject of relief, he ought to

be afforded an opportunity to test his claim on the merits." *Id.*

The United States Supreme Court has articulated this standard in *Foman*, which states, in relevant part:

> In the absence of any apparent or declared reason - such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the amendment, futility of amendment . . . , the leave sought should, as the rules require, be freely given.

*Id.* In addition, the federal courts have often admonished the filing of vexatious litigation, even where the legal and factual grounds are not of a frivolous nature. *Aetna Life Insurance Co. v. Alla Medical Services, Inc.,* 855 F.2d 1470 (9th Cir. 1988). In short, parties to a litigation may not file motions to amend "primarily to cause harassment and delay." *See Bygott v. Leaseway Transp. Corp.,* 637 F. Supp. 1433, 1447 (E.D. Pa. 1986).

In applying FED. R. CIV. P. 15(a), the Third Circuit Court of Appeals regards the possibility of prejudice to the nonmoving party as the "touchstone for the denial of the amendment." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir. 1993) (quoting *Cronell & Co., Inc. v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir. 1978)). However, the nonmoving party has a heavier burden than merely claiming prejudice, it must show that an unfair disadvantage or deprivation will result by allowing the amendment. *See generally Heyl v. Patterson Int'l, Inc. v. R.D. Rich Housing of the Virgin Islands, Inc.,* 633 F.2d 419, 426 (3d Cir. 1981); *see also, Deakyne v. Comm'rs of Lewes,* 416 F.2d 290, 300 n.19 (3d Cir. 1969).

"Prejudice," for purposes of determining whether to allow the proposed amendment,

involves serious impairment of the nonmovant's ability to present its case. *Harter v. GAF Corp.,* 150 F.R.D. 502, 509 (D.N.J. 1993). Incidental prejudice to the nonmoving party is not a sufficient basis for denial of an amendment; prejudice becomes "undue" when the nonmoving party shows that it would be unfairly disadvantaged or deprived of the opportunity to present facts or evidence that it would have offered. *Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133 F.R.D. 463, 468 (D.N.J. 1990); *DiLoreto v. Borough of Oaklyn,* 744 F. Supp. 610, 615 (D.N.J. 1990).

This Motion arrives after *more than four and one-half years* of exhaustive discovery and complex motion practice by parties represented by sophisticated counsel. Plaintiff, at this belated date, nearly a year after the close of fact discovery, seeks to again amend the Complaint. It bears reiterating, that this matter arises after the production of nearly *four million* pages of documents and the depositions of *forty-four fact witnesses*. The parties combined have submitted the reports of *twenty-six experts* and indeed continue expert depositions to date. Defendants have filed for summary judgment and the Final Pretrial Conference was begun, but not completed, on December 15, 2004.

The Court finds that permitting Plaintiff to amend the Complaint, at this late stage in the proceedings, would surely prejudice Defendants. *See e.g., Lorenz,* 1 F.3d at 1414. Specifically, allowing Plaintiff to amend the Complaint at this point "deprives [the Defendants] of fair notice, possibly discovery, and the opportunity for motion practice . . . ." *Wilson*, 303 F.3d at 1215-16. Permitting this amendment, at such a late date, could only result in a serious impairment of the nonmovant's ability to present its case. *Harter v. GAF Corp.,* 150 F.R.D. 502, 509 (D.N.J. 1993).

Additionally, permitting such an "eleventh hour" amendment would necessarily delay the commencement of an already very complex and lengthy class action trial.  Indeed, Defendants would have to examine each new claim and conduct discovery to fairly defend themselves against these new allegations.  Allowing these new amendments would also trigger fresh rounds of motion practice further delaying the end of the case.  Perhaps most significantly, Plaintiff had previous knowledge of these statements and had ample time to amend its Complaint prior to the expiration of the deadlines to amend pleadings and to conduct discovery.  Plaintiff simply offers no satisfactory reasoning as to why these statements were not included in any of the previous Amended Complaints.

**B.     Standard for Pleading Securities Fraud Actions**

In order to assert a claim pursuant to Section 10(b) of the Securities Exchange Act of 1934, Plaintiff must show (1) a false or misleading statement or an omission of material fact (2) that Defendants acted with scienter (3) upon which Plaintiffs relied (4) proximately causing Plaintiff's injury.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328 (3d Cir. 2002).  In asserting a claim under the federal securities laws, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading . . . [and] with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Champion Enterprises, Inc. Sec. Litig.,* 145 F. Supp. 2d 871, 875 (E.D. Mi. 2001) (citing 15 U.S.C. § 78u-4(b)(1)-(2)).  "Each allegation, therefore, must detail the who, what, where, when, why and how of the alleged misleading statement." *Id*.  Indeed, "[i]n any private action arising

14

under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements . . . are not met." 15 U.S.C. § 78u-4(b)(3)(A).

Regarding the amendment of complaints, "[i]f leave to amend complaints alleging securities fraud is liberally granted, then the [PSLRA] has no vitality." *In re Champion Enterprises, Inc. Sec. Litig.,* 145 F. Supp. 2d 871, 877 (E.D. Mi. 2001); *see also In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 237 (D.N.J. 2002) ("Essentially, the Reform Act would be 'meaningless' if judges liberally granted leave to amend on a limitless basis[.]"). Accordingly, Plaintiff's proposed additional claims are also subject to the heightened pleading requirements of the PSLRA. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1328 ("[A] party asserting a claim under the federal securities laws must meet the heightened pleading standard set forth under the PSLRA, enacted in 1997 to restrict abuses in securities class-action litigation").

Here, the Court is guided by the "PSLRA's unique impact of narrowing application of [the Rule 15] standard in securities fraud cases," *In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1314. The Court finds that it cannot now allow, at the tail end of litigation, what the PSLRA limited at the commencement. Indeed, permitting Plaintiff to amend the Complaint would allow it "to make an end run around the requirements of the [PSLRA]." *In re Champion Enterprises, Inc. Sec. Litig.,* 145 F. Supp. 2d at 877. The PSLRA requires specificity and particularity when alleging false or misleading statements as the basis of recoverable claims in securities fraud actions. *See* 15 U.S.C. § 78u-4(b)(1). The Court should not permit parties to become "moving targets" – confronted with new allegations in 2005, for a case that began in 2000. Again, Plaintiff was free to include the statements in previous Complaints, and fails to adequately explain the omissions. In this particular case, alleged misrepresentations of Defendants have

been previously "vetted" through a comprehensive dispositive motion practice as contemplated by the PSLRA. To begin that process anew, with a new motion to dismiss, makes no sense.

### III.     CONCLUSION

Plaintiff's Motion to amend the Complaint to include the above-referenced statements as claims is denied. The Court finds that Plaintiff had ample opportunity to amend the Complaint to add these new statements, prior to the expiration of the deadlines to amend pleadings and to conduct discovery, and failed to do so. Accordingly, the Court finds that allowing the amendment now would result in undue delay to this already protracted litigation. Additionally, the Court finds that given the advanced stage of the litigation, coupled with the enormity of discovery, amendment at this late stage would result in undue prejudice to the Defendants.

Alternatively, the Court concludes that granting leave to amend the Complaint at this time would frustrate the heightened pleading requirements of the PSLRA, triggering fresh rounds of motion practice further delaying the end of the case. The Motion is therefore alternatively denied under the heightened pleading standard set forth under the PSLRA.

Finally, claims of Plaintiff that it was necessary to await decision on various dispositive motions or other developments in the case before seeking to add new alleged misrepresentations are illusory. The new claims could have been added after depositions of the speakers had been conducted or certainly before eight months had passed after the conclusion of fact discovery. There will always be more to "discover" and more to do in a case of this magnitude. The real issue is whether the Plaintiff class has had a full and fair opportunity to conduct discovery and adequately plead its case. The answer is a resounding yes. Illustrative is the comment widely attributed to Terence F. MacCarthy, Esquire, Federal Defender in Chicago: *The difference between trial lawyers and litigators is that litigators are always prepared but never ready.* This case is now ready for final resolution. An appropriate Order accompanies this Memorandum

Opinion.

DATED: April 27, 2005.