UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- x
              :
IN RE BRISTOL-MYERS SQUIBB SECURITIES :   Civil Action No. 00-1990 (SRC)
LITIGATION                      :
              :   Return Date: June 6, 2005
              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - -- x


**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DEFENDANTS' TWO
DAMAGES EXPERTS DRS. PAUL GOMPERS AND BRADFORD CORNELL ON
<u>DAUBERT</u> GROUNDS AND TO STRIKE THIS TESTIMONY FROM
DEFENDANTS' SUMMARY JUDGMENT MOTION**

Allyn Z. Lite (AL 6774)
Joseph J. DePalma (JD 7697)
LITE DEPALMA GREENBERG
& RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey  07102
(973) 623-3000

Liaison Counsel for Lead Plaintiff
   and the Class

Thomas A. Dubbs
James W. Johnson
Nicole M. Zeiss
GOODKIND LABATON RUDOFF
& SUCHAROW LLP
100 Park Avenue
New York, New York  10017
(212) 907-0700

Lead Counsel for Lead Plaintiff
   and the Class

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.   Legal Standards Governing Admission of Expert Testimony .............................. 2

    A.   Threshold Question of Qualification ......................................................... 3

    B.   Unreliable Testimony Should Be Excluded................................................ 3

    C.   Testimony That Does Not Meet "Fit" Requirement Should Be
        Excluded .................................................................................................... 5

II.   Dr. Gompers' Opinion Concerning Reliance Should Be Stricken ....................... 7

III.   Dr. Gompers' Opinions Concerning Materiality Should Be Stricken ................. 10

    A.   Dr. Gompers' "Artificial Share Price Inflation" Argument Does Not
        Meet Daubert's Standards........................................................................ 11

    B.   Dr. Gompers' Conclusion that The Corrective Disclosures Contained
        Information Already Known to The Market Is Based On Erroneous
        Assumptions And A Limited And Incomplete Selection of Documents .................... 14

IV.   Dr. Gompers' Opinions Concerning Causation Should Be Stricken................... 17

V.   Dr. Gompers Is Precluded From Addressing Market Efficiency Since
    Defendants Have Admitted That The Market for BMS Stock Was Efficient ................... 19

VI.   The "Background" Portion of Dr. Cornell's Report Must be Excluded ............................ 23

VII.   Dr. Cornell's Opinion on the Economic Incentives of Securities Fraud in
    this Case Must Be Excluded ................................................................................ 25

VIII.   In Performing His Analysis Dr. Cornell Did Not Consider Relevant
    Information .......................................................................................................... 27

IX.   Dr. Cornell's Statement That BMS Did Not Conceal The Side Effects Of
    Vanlev Must Be Excluded .................................................................................. 27

X.    Either Dr. Gompers or Dr. Cornell Should Be Precluded From Offering
      Their Expert Opinions Because They Are Entirely Cumulative and
      Repetitive ........................................................................................................................... 29

CONCLUSION ................................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Page</u>

Cammer v. Bloom,
    711 F. Supp. 1264 (D.N.J. 1989) ....................................................................................22

Crowley v. Chait,
    322 F. Supp. 2d 530 (D.N.J. 2004) ...............................................................................5, 6

Daubert v. Merrell Dow Pharms., Inc.,
    509 U.S. 579 (1993)............................................................................................... passim

Deutschman v. Beneficial Corp.,
    132 F.R.D. 359 (D. Del. 1990) .......................................................................................22

In re Diet Drugs Prod. Liab. Litig.,
    No. MDL 1203, 2000 WL 962545 (E.D. Pa. June 28, 2000) .............................................3

Elcock v. Kmart Corp.,
    233 F.3d 734 (3d Cir. 2000)..........................................................................................3, 4

Estate of Lam v. Upjohn Co.,
    No. 94-0033-H, 1995 WL 478844 (W.D. Va. Apr. 21, 1995)............................................3

General Elec. Co. v. Joiner,
    522 U.S. 136 (1997)......................................................................................................2, 4

Guillory v. Domtar Indus. Inc.,
    95 F.3d 1320 (5th Cir. 1996) ...........................................................................................6

In re Initial Public Offering Sec. Litig.,
    174 F. Supp. 2d 61 (S.D.N.Y. 2001)................................................................................7

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999)..................................................................................................2, 3, 4

Magistrini v. One Hour Martinizing Dry Cleaning,
    180 F. Supp. 2d 584 (D.N.J. 2002), aff'd
    No. 02-2331, 2003 WL 21467223 (3d Cir. 2003) ............................................................4

Meschino v. North Am. Drager, Inc.,
    841 F.2d 429 (1st Cir. 1988)...........................................................................................21

Moskowitz v. Lopp,
 128 F.R.D. 624 (E.D. Pa. 1989) ........................................................................8

In re Nortel Networks Corp. Sec. Litig.,
 No. 01cv1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) ..........................8

In re Oxford Health Plans, Inc.,
 191 F.R.D. 369 (S.D.N.Y. 2000) ......................................................................9

In re Paoli R.R. Yard PCB Litig.,
 35 F.3d 717 (3d Cir. 1994)................................................................................6

Planned Parenthood v. Verniero,
 22 F. Supp. 2d 331 (D.N.J. 1998) ....................................................................29

Roberson v. City of Philadelphia,
 No. 99-3574, 2001 WL 210294 (E.D. Pa. Mar. 1, 2001) .................................7

In re Schering-Plough Sec. Litig.,
 Civil Action No. 01-0829 (D.N.J. April 17, 2003) ..........................................8

Schieber v. City of Philadelphia,
 No. 98-5648, 2000 WL 1843246 (E.D. Pa. Dec. 13, 2000)...............................7

Schneider v. Fried,
 320 F.3d 396 (3d Cir. 2003)..............................................................................2

Sunstar, Inc. v. Alberto-Culver Co.,
 No. 01 C 0736, 2004 Wl 1899927 (N.D. Ill. Aug. 23, 2004) ...........................29

In re TMI Litig.,
 193 F.3d 613 (3d Cir.1999)...............................................................................5

United States v. Downing,
 753 F.2d 1224 (3d Cir. 1985)............................................................................5

United States v. Leo,
 941 F.2d 181 (3d Cir. 1991)..............................................................................7

United States v. Watson,
 260 F.3d 301 (3d Cir. 2001)..............................................................................7

In re Vesta Insurance Group, Inc. Sec. Litig.,
 No. 98-AR-1407-S,
 1999 U.S. Dist. LEXIS 22233 (N.D. Ala. Oct. 25, 1999) .................................9

# RULES

Fed. R. Civ. P. 1 ...............................................................................................29

Fed. R. Civ. P. 16 .............................................................................................29

Fed. R. Evid. 104 ...............................................................................................1

Fed. R. Evid. 401 ...............................................................................................2

Fed. R. Evid. 402 ...........................................................................................2, 29

Fed. R. Evid. 403 ...........................................................................................2, 29

Fed. R. Evid. 611 .............................................................................................29

Fed. R. Evid. 702 ........................................................................................ passim

Fed. R. Evid. 703 .........................................................................................1, 2, 5

Fed. R. Evid. 704 .........................................................................................1, 2, 6

# CODES

17 C.F.R. § 240.106-5(6) ..................................................................................12

# MISCELLANEOUS

29 C. Wright & V. Gold, Fed. Prac. &
    Pro. § 6273 (1997) .......................................................................................5

29 C. Wright & V. Gold, Fed. Prac. &
    Pro. § 6284 (1997) .......................................................................................6

## PRELIMINARY STATEMENT

Lead Plaintiff, the LongView Collective Investment Fund ("Lead Plaintiff"), respectfully submits this memorandum of law in support of its motion *in limine*, pursuant to Federal Rules of Evidence 104 and 702 through 704, to exclude certain testimony of defendants' two damages experts, Drs. Paul Gompers and Bradford Cornell, and to strike that testimony from defendants' motion for summary judgment.  Defendant Bristol-Myers Squibb ("BMS" or the "Company"), along with individual defendants Charles A. Heimbold ("Heimbold"), Peter R. Dolan ("Dolan") and Peter S. Ringrose ("Ringrose") (collectively, "Defendants"), have proffered expert evidence from 18 witnesses in support of their joint motion for summary judgment and defenses in this action.[1]

## STATEMENT OF FACTS

In light of the recent submission of papers in support of and opposition to Defendants' motion for summary judgment and the Court's August 30, 2004 opinion, familiarity with the facts underlying the claims is presumed.  Drs. Gompers and Cornell have each submitted reports opining on whether, and to what extent, there are damages in this action caused by the alleged misstatements.  They each opine on market influences on BMS stock, they each do an event study for the class periods and they each critique Lead Plaintiff's damages experts.  Certain of these expert opinions must be precluded for the reasons discussed herein, but it is also clear that their testimony is needlessly cumulative and Defendants' should be required to choose one of

---

[1]   Defendants' expert reports were submitted as exhibits 11-28 to the Declaration of Samira Shah, Esq. in Support of Defendants' Motion for Summary Judgment, dated December 17, 2004. To the extent any exhibits cited herein were submitted in support or opposition to Defendants' summary judgment motion, they will be referred to as either "PX" or "DX" and will bear their original summary judgment reference number.  Any new exhibits, which were not submitted either in support or opposition to Defendants' summary judgment motion, are being submitted herewith as exhibits to the Declaration of James W. Johnson, Esq. In Support of Lead Plaintiff's Motions In Limine to Exclude Testimony of Defendants' Expert Witnesses on Daubert Grounds and to Strike Such Testimony From Defendants' Summary Judgment Motion, dated May 13, 2005 ("Johnson Decl."), and are referred to as "Pl. Ex. ___.'"

these experts to testify on these matters and only one of their reports should be considered on

summary judgment.

## ARGUMENT

**I.**    **Legal Standards Governing Admission of Expert Testimony**

Rules 702 through 704 of the Federal Rules of Evidence govern the admissibility of

expert testimony, subject to the relevancy provisions of Rules 401 through 403.  Rule 702

provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The rule was amended in 2000 in response to Daubert v. Merrell Dow

Pharms., Inc., 509 U.S. 579 (1993), and to the many cases applying Daubert, including Kumho

Tire Co. v. Carmichael, 526 U.S. 137 (1999) and General Elec. Co. v. Joiner, 522 U.S. 136, 140

(1997).  More recently, in Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003), the Third Circuit

described these requirements as the "trilogy of restrictions on expert testimony: qualification,

reliability and fit."

As is well known, in Daubert the Supreme Court directed district courts to perform a

screening or "gatekeeping" function to insure that evidence presented by expert witnesses is

relevant, reliable, and helpful to the jury's evaluation of such evidence.  Daubert, 509 U.S. at

589, 597.  In Kumho Tire, the Supreme Court reiterated this role and clarified that the gatekeeper

function applies to all expert testimony, not only scientific testimony.  Kumho Tire, 526 U.S. at

151.

2

### A.    Threshold Question of Qualification

Central to the question of admissibility, an expert witness must be qualified to testify to the opinions he intends to express. Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 156.  In Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), the Third Circuit reaffirmed the standard for qualifying an expert:

> Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony.  The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials.'  We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualification of experts.'

Id. at 741 (internal citations omitted).   An expert may be excluded when his training and experience is lacking in the particular area in which his testimony is offered.  For example in Estate of Lam v. Upjohn Co., No. 94-0033-H, 1995 WL 478844, at *2 (W.D. Va. Apr. 21, 1995) the court excluded expert testimony on pharmaceutical warnings when the expert had "no academic training or regulatory experience and ha[d] never participated in any FDA-related proceedings addressing what constitutes an adequate warning."  Thus, "a party cannot qualify an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." In re Diet Drugs Prod. Liab. Litig., No. MDL 1203, 2000 WL 962545, at * 3 (E.D. Pa. June 28, 2000).

### B.    Unreliable Testimony Should Be Excluded

The essential guidance learned from Daubert, Kumho Tire and Joiner is that an expert's testimony must be based upon sufficient facts and flow from the reliable application of sound reasoning or methods. Fed. R. Evid. 702.  "An expert's opinion is reliable if it is 'based on the "methods and procedures of science" rather than on "subjective belief or unsupported

speculation"; the expert must have "good grounds" for his or her belief.'" Elcock, 233 F.3d at 745.

The non-exclusive checklist of factors set forth by Daubert and its progeny for courts to use in assessing whether a particular scientific methodology is reliable, and thereby admissible, include: (a) whether a "theory or technique…can be (and has been) tested;" (b) whether it "has been subjected to peer review and publication;" (c) whether, in respect to a particular technique, there is a high "known potential rate of error" and whether there are "standards" controlling the application of the technique; and (d) whether the theory or technique enjoys "general acceptance" within" a "relevant scientific community." Kumho Tire, 526 U.S. at 149 (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-94 (1993)).  "The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.  That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony."  Id. at 152; see also Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594-95 (D.N.J. 2002) (noting additional factors such as whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion or whether the expert has adequately accounted for alternative explanations), aff'd, No. 02-2331, 2003 WL 21467223 (3d Cir. 2003).

Although an overused phrase, it is applicable to the testimony challenged here: "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Joiner, 522 U.S. at 146.

"To be sure, an expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony." Crowley v. Chait, 322 F. Supp. 2d 530 (D.N.J. 2004); see also 29 C. Wright & V. Gold, Fed. Prac. & Pro. § 6273, at 312 (1997) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.")

Defendants' experts also cannot rely on a record selectively limited by Defendants.  In Crowley v. Chait, 322 F. Supp. 2d 530, 542 (D.N.J. 2004), one of the plaintiff's insurance industry experts based his report, in part, upon summaries of deposition testimony pre-selected by counsel.  The court barred as unreliable those parts of the report which relied upon this subset of information, and admitted the report only to the extent that it was based on the expert's own independent examination of the claims files.  The court, citing In re TMI Litig., 193 F.3d 613, 697 (3d Cir.1999), stated that "[t]he information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for Daubert purposes."  Crowley, 322 F. Supp. 2d at 542.

### C.    Testimony That Does Not Meet "Fit" Requirement Should Be Excluded

In addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact in its determination of the claims and defenses.  As the Third Circuit stated in United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985), admissibility depends, in part, on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case."  Thus, if an opinion is not relevant to the facts of the case, it is not admissible.

Also, proffered opinions must flow from a sound application of methods to the facts of a case in order to be helpful. Although proponents of expert evidence do not have to "prove their case twice," they "have to demonstrate by a preponderance of evidence that their opinions are reliable." In re Paoli R.R.Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).   Expert opinion based on facts that are indisputably incorrect is also inadmissible, as it is both irrelevant and not helpful to the trier of fact.  See, e.g., Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1331-1332 (5th Cir. 1996) (excluding testimony based on altered forklift).

Lay person testimony "masquerading" as expert testimony is inadmissible.  "[T]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject in dispute."   Fed. R. Evid. 702 advisory committee's note (1972).

Furthermore, although an expert may opine on an ultimate issue of fact, Fed. R. Evid. 704, he "may not substitute his judgment for the jury's. 'When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination." Crowley, 322 F. Supp. 2d at 554 (precluding opinion on the credibility or consistency of other testimony and that which summarized facts) (internal citation omitted).

> Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for the exclusion of evidence which wastes time.  These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach….They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

Fed. R. Evid. 704 advisory committee's note; see also 29 C. Wright & V. Gold, Fed. Prac. & Pro. § 6284, at 379-80 (1997) (same).

In <u>Schieber v. City of Philadelphia</u>, No. 98-5648, 2000 WL 1843246, at **8-9 (E.D. Pa. Dec. 13, 2000) (civil rights action), the court precluded the plaintiff's proffered police practices expert from testifying that the City's failure to train its police officers caused a violation of the crime victim's constitutional rights, because the opinion amounted to a legal conclusion. Similarly, an expert cannot opine on whether a person acted with a requisite state of mind.  <u>See</u>, <u>e.g.</u>, <u>United States v. Watson</u>, 260 F.3d 301 (3d Cir. 2001) (rule violated where examination elicited testimony about mental state of defendant or when expert directly refers to intent or mental state); <u>see also</u> <u>Roberson v. City of Philadelphia</u>, No. 99-3574, 2001 WL 210294, at *7 (E.D. Pa. Mar. 1, 2001) (expert could not opine on whether a third-party or their friends feared arrest).

In this same vein, expert opinions on matters of law must be excluded. "In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law."  <u>In re Initial Public Offering Sec. Litig.</u>, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("IPO") (citing numerous cases).  The Third Circuit follows this well established rule.  <u>United States v. Leo</u>, 941 F.2d 181, 196 (3d Cir. 1991)("it is not permissible for a witness to testify as to the governing law.").  Even in the rare case in which an expert may testify on a mixed issue of law and fact, "the testimony must remain focused on helping the jury or judge understand particular facts in issue and not opine on the ultimate conclusion."  <u>IPO</u>, 174 F. Supp. 2d at 65.

## II.    **Dr. Gompers' Opinion Concerning Reliance Should Be Stricken**

In Section 4 of his Report, Dr. Gompers opines on Lead Plaintiff's reliance.  (DX 14 ¶¶ 2, 17-22.)  In this section of his Report, Dr. Gompers concludes that Lead Plaintiff could not have relied on Defendants' misrepresentations in purchasing or selling BMS stock because it is an index fund.  Dr. Gompers concludes:

> This evidence indicates that LongView Collective Investment
> Fund could not have relied on any alleged misinformation or
> omissions in the market because they did not even pay attention to
> this sort of information and it does not enter their investment
> decision making.

(DX 14 ¶ 22.) (citing his Exhibits 3, 4 and 5 that set forth Lead Plaintiff's trades in BMS stock).[2]

Dr. Gompers' conclusions do not meet <u>Daubert</u> standards for at least two reasons.  First, he testified during his deposition that an index fund is entitled to rely on the truthfulness of a company's public statements.  In his words, an index fund "based on sort of our legal and regulatory environment, can assume that the firm and its employees are attesting to honesty and accuracy of the information" publicly disclosed by the Company.  (Pl. Ex. 3 214:11-15.)

Second, Dr. Gompers' opinion is contrary to applicable and well-established case law. Courts have consistently held that the use of index or passive strategies by large institutional investors such as LongView is quintessential proof that these types of investors rely on the integrity and efficiency of the markets.  For example, in <u>In re Schering-Plough Sec. Litig.</u>, Civil Action No. 01-0829 (D.N.J. April 17, 2003), defendants argued that the plaintiff's passive investment strategy, carried out through a computer system designed to mimic the S&P 500 Index, rebutted the fraud on the market presumption.  Rejecting the argument, the court found that in making its investment decisions, the fund relied "on both the efficiency of the market Schering-Plough was trading in as well as Schering's historical and current stock price trends. As such, the fraud on the market theory remains relevant and applicable to the present action." <u>Id</u>. at 6-7.  See <u>In re Nortel Networks Corp. Sec. Litig.</u>, No. 01cv1855, 2003 WL 22077464 at *3 (S.D.N.Y. Sept. 8, 2003) (rejecting argument of non-reliance where plaintiff used index strategy); <u>Moskowitz v. Lopp</u>, 128 F.R.D. 624, 631 (E.D. Pa. 1989) (the use of different investing strategies is irrelevant in a fraud on the market case).

---

[2]   All references to "Exhibit __" refer to exhibits Dr. Gompers attached to his report (DX 14.)

In re Vesta Insurance Group, Inc. Sec. Litig., No. 98-AR-1407-S, 1999 U.S. Dist. LEXIS 22233 (N.D. Ala. Oct. 25, 1999), defendants argued that plaintiff could not rely on the fraud on the market presumption because it left "the decision to purchase Vesta stock to a computer program . . . or to an outside manager."  1999 U.S. Dist. LEXIS 22233, at *18. Rejecting this argument – which is the same argument Gompers makes here – the court found plaintiffs:

> might have had an investment strategy that included Vesta stock, for any number of legitimate reasons.  That investment strategy is none of defendant's business; it is none of the court's business …. Whatever the strategy, [plaintiff] should have been able to presume that the market price for Vesta was based on honest and accurate financial information….

Id. at *25.

The decision in In re Oxford Health Plans, Inc., 191 F.R.D. 369, 376 (S.D.N.Y. 2000), is further instructive.  There, defendants argued that plaintiffs had not relied on the misstatements because of their "proprietary investing methodology."  Judge Brieant rejected the argument and held that the plaintiffs relied on the market and further noted that "[n]o purchaser of securities regardless of trading methodology or strategy would knowingly trade where material information has been misstated or withheld by an issuer."  Id.  As Judge Brieant also noted, "[a]ll of the usual smoke and mirrors and computer programs to rank stocks, relied on by professionals, have at their foundation an assumption that there is an efficient public market."  Id. at 376.

LongView's computer program provided it with information to purchase and sell stock to create and maintain a portfolio designed in principle to replicate the proportional market capitalization of the S&P 500 index.  When LongView made purchases under the program, it purchased securities of each company based upon each company's proportional market capitalization.  Thus, if BMS's market capitalization equaled two percent of the total market

capitalization of the stocks in the S&P 500 index, the program would instruct LongView to use two percent of its assets available for investment in the index fund to purchase BMS stock.

Because the purchases of BMS securities were based upon its market capitalization as a proportion of the total market capitalization of the stocks in the S&P 500 index, and because the price of BMS's securities were artificially inflated as a result of Defendants' misrepresentations and omissions, BMS's market capitalization was also artificially inflated.  As a result, because of the fraud, based on the instructions received from the computer program, LongView spent more money purchasing BMS stock at its artificially inflated price, and purchased more shares of BMS, than it otherwise would have.

As a result, the use of computer models does not sever the reliance link, as numerous courts have held.  Dr. Gompers' opinion is contrary to well-established case law, will not aid the trier of fact and should be stricken.

### III.   Dr. Gompers' Opinions Concerning Materiality Should Be Stricken

In Section 5 of his Report, Dr. Gompers discusses materiality and offers two opinions. First, he concludes, based on his Exhibits 9 and 10, that:

> there were no days on which there were alleged misstatements or omissions by BMS and statistically significant positive unexplained price movements in BMS stock.  Hence, none of the misstatements or omissions were material, and hence they could not have contributed to any alleged share price inflation.

(DX 14 ¶ 26.)  However, as more fully set forth below, this "Artificial Share Price Inflation" argument is undermined by his admission during his testimony that it does not apply to or encompass omissions of material fact, and does not consider whether the misrepresentations were already in the market.

Second, Dr. Gompers concludes that the alleged curative disclosures at the end of each class period "generally contained information already known to the market."  (DX 14 ¶ 23.)

However, his conclusion is based on a simplistic comparison of BMS's misrepresentations at the American Heart Association ("AHA") seminar in November 1999 with the Company's corrective disclosure in April 2000.  Dr. Gompers never considered whether the truth was on the market concerning the incidence and severity of angioedema, and once again did not factor into his conclusion Defendants' material omissions.

      A.     **Dr. Gompers' "Artificial Share Price Inflation"**
                <u>**Argument Does Not Meet Daubert's Standards**</u>

Dr. Gompers attempts to show "that the alleged misinformation releases were not associated with significant inflation in the stock price as would be required if the information were considered material."  (DX 14 ¶ 3.)  He explained during his deposition that:

> And therefore in order to identify that, to show that it was material, we can go to the particular dates on which these statements were made, as outlined in both the plaintiff theory and the plaintiff expert reports, and try to determine whether or not the market considered those statements material, meaning did they drive the stock price up.

(Pl. Ex. 3 105:15-22.)

However, he subsequently testified that he did not list any omissions alleged by Lead Plaintiff in his Exhibit 10.

> Q.     Am I correct in assuming that what you are listing in Exhibit 10 are the alleged misrepresentations set forth by the plaintiff?
>
> A.     Yes.
>
> Q.     Are you purporting to list anywhere on Exhibit 10 any omissions alleged by lead plaintiff?
>
> A.     No.

(Pl. Ex. 3 120:2-9.)

Furthermore, *Dr. Gompers testified that he would not expect the stock price of a company to react to an omission of material fact.*

> Q.     Would you ever expect the stock price of a company to react to an omission of material fact?
>
>                         * * *
>
> A.     I guess in many circumstances it wouldn't – I mean, if there was no other information released and the omission was material, it wouldn't move, potentially.

(Pl. Ex. 3 117:15-22.)

Since Dr. Gompers did not consider what statements defendants omitted to state in order to make the statement not misleading, 17 C.F.R. § 240. 106-5(6), his analysis and conclusions in this section of his report are unreliable and do not aid the trier of fact.

Dr. Gompers also testified that he did not consider whether the market did not react to BMS's misrepresentations because the news contained in the misrepresentations had been previously disseminated by BMS to the market.

> Q.     Did you consider, in listing the alleged misstatements and omissions in Exhibit 10 of your report, that the market did not react to those misrepresentations or omissions because the news contained in the misrepresentations or omission was already on the market?
>
>                         * * *
>
> A.     I think that – clearly the market didn't react to it, so it's either the case that the market already knew it or the market didn't really consider it material in the sense of changing their forecast.
>
> Q.     So it is a possibility that the market didn't react because it already knew the information contained in the misrepresentation?
>
>                         * * *
>
>        Actually could you please read back the prior answer? I got distracted.  (Record read.)

> A.      I would qualify that by saying alleged misinformation.  But that, I guess, is possible.

(Pl. Ex. 3 116:5.25.)

Here, the alleged misrepresentations were, in fact, disseminated to the market long before the commencement of the first class period in the fall of 1999.  See, e.g., In re Bristol-Myers Squibb Co. Sec. Litig., C.A. No. 00-1990 (SRC), Opinion at 5-6 (D.N.J. Aug. 30, 2004) (listing numerous misrepresentations issued by Defendants prior to November 1999).  However, Gompers did not look at or consider this fact.

> Q.      If I could direct your attention to the entry for December 1, 1999 [on Exhibit 10].  The misrepresentation that was upheld by the court in this announcement was in part that omapatrilat was well-tolerated and discontinuation rates due to adverse events were similar in the omapatrilat, lisinopril and placebo groups.
>         And did you take into consideration in your report that that information in those words had previously been disclosed to the market?
>
> * * *
>
> A.      What I'm considering here is did the market consider these particular announcements material to the stock price.  *What was known prior to November 8th I haven't looked at.*  But as far as my analysis here, it shows that there's no stock price movement on these dates, as would be consistent with the plaintiff's theory.
>
> Q.      Is it safe for me to assume that for all of the misrepresentations you've listed in Exhibit 10 that you did not go back and analyze whether the information set forth by the company in the alleged misrepresentation had previously been disclosed to the market?
>
> * * *
>
> A.      I did not.

(Pl. Ex. 3 122:18-123:19.)  (emphasis added).

**B.      Dr. Gompers' Conclusion that The Corrective Disclosures Contained Information Already Known to The Market Is Based On Erroneous Assumptions And A Limited And Incomplete Selection of Documents**

In paragraphs 27 through 35 of his Report, Dr. Gompers discusses the corrective disclosure issued by BMS on April 19, 2000 and March 20, 2002 and concludes that:

> Because they did not contain information new to the market, the alleged corrective disclosures could not have caused a decline in alleged share price inflation.

(DX 14 ¶ 35.)

During his deposition, he explained his analysis as follows:

> Q.      Where in your report do you list or describe your method for how you went and viewed the information that was already in the market prior to the April 19th disclosure regarding the incidence and severity of angioedema?
>
> A.      As we talked about first before any of this discussion on April 19th, the stock price reacted to the announcement of a withdrawal of the NDA and not discussions of the specific incidences and rates of angioedema.
>      Second, throughout this section I point out that the rates and incidences of angioedema which were discussed on April 19th were approximately the same rates which were discussed on November 8th, 1999, and at other points in time.

(Pl. Ex. 3 149:18-150:9.)

However, Dr. Gompers' entire argument is constructed on a flawed assumption.  He testified that the corrective decision issued by BMS on April 19, 2000 announced that it was withdrawing the NDA due to the FDA's concern over the incidence and severity of angioedema seen in the VANLEV clinical trials.  (Pl. Ex. 3 154:1-7.)  Dr. Gompers discounts the following portion of the announcement – "FDA's concern over the incidence and severity of angioedema" – because, he claims, that information "largely repeated information previously disclosed by BMS."  (DX 14 ¶ 31.)  He bases this finding on a review of a handful of statements made about

14

VANLEV on three dates – November 8, 1999, November 9, 1999, and January 10, 2000 – and compares them to the press release issued by BMS on April 19, 2000.  (Pl. Ex. 3 141:17-142:9.)

However, Dr. Gompers never considered the misrepresentations issued by Defendants on other dates during the first class period that have been upheld by the Court, including Hayden's statement on October 19, 1999 to analysts, Ringrose's statement on November 29, 1999 to the Financial Times, BMS's press releases issued on December 20, 1999 and January 13, 2000, and Ferdinand's statements at the ACC Seminar on March 11, 2000.  Accordingly, his selective use of alleged misrepresentations on selective dates is unsound, improper and unreliable.

In addition, Dr. Gompers testified that his conclusions were drawn from a single comparison of the rates and incidences of angioedema discussed by Black and Weber at AHA in November 1999 compared to what was disclosed by BMS in its corrective press release.

> Q.     Where in your report do you list or describe your method for how you went and viewed the information that was already in the market prior to the April 19th disclosure regarding the incidence and severity of angioedema?
>
> A.     As we talked about first before any of this discussion on April 19th, the stock price reacted to the announcement of a withdrawal of the NDA and not discussions of the specific incidences and rates of angioedema.
> Second, *throughout this section I point out that the rates and incidences of angioedema which were discussed on April 19th were approximately the same rates which were discussed on November 9th, 1999, and at other points in time.*

(Pl. Ex. 3 149:18-25-150:9.)  (emphasis added).  He continued:

> Q.     And the information in the market prior to April 19th concerning the incidence and severity of angioedema included Dr. Weber's presentation at AHA in November of 1999 and what the company disclosed immediately after the withdrawal regarding the incidence of angioedema in the clinical trials; correct?
>
> A.     Correct.

(Pl. Ex. 3 150:24-151:7.)

Dr. Gompers' analysis does not take into consideration whether the information concerning the incidence and severity of angioedema disclosed by BMS at AHA in November 1999 and in the April 2000 corrective disclosure was accurate.  By his own admission, he never considered whether the true incidence and severity of angioedema was known to the market.

> Q.      Did you consider, in preparing your report, the possibility that the incidence and severity of angioedema was not known to the market prior to April 19, 2000?
>
> * * *
>
> A.      I considered the documents that were in record, the transcripts of the presentation of what analysts said after the November 8th, 1999, American Heart Association presentations, other statements from the company.
> So there were discussions of incidence and severity of angioedema, and I take them for what they are and compare them to other announcements later on about incidence and severity of angioedema.  But then I also look at how the stock price reacts to various pieces of information.
>
> Q.      And then how do you explain that analysts who are covering the company testified that they weren't aware of the incidence and severity of angioedema until the issuance of the press release by BMS on April 19th, 2000?
>
> * * *
>
> A.      I haven't reviewed their deposition testimony, so I don't know what they said or did not say and what particular aspects of the incidence and severity they didn't know.

(Pl. Ex. 3 158:6-159:8.)

Dr. Gompers also did not review or consider FDA reports during the first class period in which the FDA raised serious concerns about the incidence and severity of angioedema, including that 1 in 1,000 patients taking Vanlev would experience life-threatening angioedema leading to intubation.  (Pl. Ex. 3 97:17-98:3, 98:11-14.)  Nor was he aware that Defendants did

not publicly report other cases of life-threatening angioedema in the Vanlev clinical trials.

(Pl. Ex. 3 98:15-21.)

As discussed in the prior Section, Dr. Gompers' review of selected data and his failure to consider Defendants' material omission render his opinion incomplete and unreliable.

## IV.   Dr. Gompers' Opinions Concerning Causation Should Be Stricken

In Section 6 of his Report, Dr. Gompers "begin[s] considering the causes of these [BMS stock price] declines" on April 19, 2000 (a $29 billion drop) and March 20, 2002 (a $15 billion drop).  (DX 14 ¶¶ 36-37.)  Since he has ruled out BMS's corrective disclosures as a cause for the stock price drops (DX 14 ¶ 37.), Dr. Gompers, in essence, guesses at the possible causes.

For the first stock price drop, Dr. Gompers, lists five potential causes:

> I find that a more likely explanation for the price declines is industry repricing due to: a shift in FDA policy toward drug approvals; pending patent expiration on a series of major drugs at large pharmaceutical companies; increasing competition from generic drugs; an unimpressive pipeline of new potential "blockbuster" drugs; and the expectations of potential new restrictions on drug pricing.

(DX 14 ¶ 41.)  While he applies all five factors to the first stock price drop on April 19, 2000 (Pl. Ex. 3 194:23-195:10.), only the last three factors apply to the second price drop on March 20, 2002, according to Dr. Gompers.  (Pl. Ex. 3 196:7-197:13.)

However, all of these factors are mere "possibilities."

> Q.    And you say "could be."  It's a possibility; correct?
>
> A.    That is correct.
>
> Q.    And you don't know for [a] certainty that it was in fact caused by those three industry factors, do you?
>
> A.    And I haven't measured the exact amount.

* * *

> Q.     So the five industry factors operative in the first class
> period and the three industry factors operative in the second class
> periods are potential explanations for the BMS stock price drop?
>
> A.     They're potential contributors to the stock price drop.

(Pl. Ex. 3 199:22-200:5, 201:15-21.)

However, Dr. Gompers does not have any expertise in FDA issues (Pl. Ex. 3 70:21-23.)

and that alone is a basis to strike his analysis regarding "Change in FDA Approval Regime."

(DX 14 ¶¶ 62-70.)  He bases his five "possibilities" on a series of charts, quotes from news

accounts and articles (DX 14 at Exhibits 27-31.), which he obtained "from a web site because it

had to do with a cardiac treatment for hypertension."  (Pl. Ex. 3 177:1-4.)  This entire section is

based on nothing more than hearsay and it should be stricken.

Also, Dr. Gompers places great emphasis on BMS's stock price movement as compared

to the pharmaceutical industry.  (DX 14 ¶¶ 45-55.)  Dr. Gompers testified that the April 19, 2000

BMS stock price drop of $29 billion was "based on a delayed reaction to those five industry

factors" that he identified.  (Pl. Ex. 3 186:4-9.)  His empirical support for this proposition is his

stock price charts, including his Exhibit 26.  (Pl. Ex. 3 187:3-9, 188:11-14.)  In these graphs, Dr.

Gompers attempts to show "that very similar factors are moving Bristol and the pharmaceutical

index…"  (Pl. Ex. 190:22-24.)

However, these graphs do not support Gompers' argument.  He admitted that:

> Q.     And you don't know what those common factors are if
> you're relying just on this graph, correct?
>
> A.     Yes.

(Pl. Ex. 3 191:4-7.)

He further admitted that if you exclude from the graphs the dates on which BMS stock

dropped (i.e., April 19, 2000 and March 20, 2002), the price of BMS stock would not have

reacted differently from the price of other pharmaceutical companies' stocks based on the industry factors identified by Dr. Gompers.  (Pl. Ex. 3 203:4-205:10.)  Therefore, the only day in which the industry factors impact BMS stock -- and no other pharmaceutical company stock – are the days on which BMS issued its corrective disclosures.  He does not offer, and cannot offer, any plausible explanation for why the five industry factors suddenly impacted BMS and no other pharmaceutical stock on April 19, 2000 and March 20, 2002, when the stock price movements of BMS and other pharmaceutical companies were similar prior to those two dates.

Indeed, Dr. Gompers did not investigate whether any other pharmaceutical company's stock dropped upon an announcement of an NDA or product withdrawal.

> Q.      In preparing your report, did you look to see if any of the companies in your pharmaceutical index announced the withdrawal of a drug or the withdrawal of an NDA and whether or not its stock price dropped upon release of that news?
>
> A.      I haven't looked whether or not any of the firms withdrew their NDA and what the stock price reaction was.  I have looked at the list of firms that withdrew drugs.  I have not looked at the stock price reaction of those firms in response to those drug withdrawals.

(Pl. Ex. 3 202:9-20.)

## V.      Dr. Gompers Is Precluded From Addressing Market Efficiency Since Defendants Have Admitted That The Market for BMS Stock Was Efficient

Dr. Gompers opines at length concerning "whether or not the evidence indicates that BMS traded in an efficient market."  (DX 14 ¶ 79.)  Dr. Gompers, consistent with his testimony in six other securities fraud cases in which he was hired by defendants as a paid expert, found that the market for BMS stock was not efficient.

> Q.      In any of those six securities fraud cases [in which you previously testified as an expert] have you opined that the stock of the company was traded in an inefficient manner?
>
> A.      Yes.

> Q.     In which cases have you so opined?
>
> A.     That would be all of them except for Ratheon.
>
> Q.     And why didn't you take that position in Ratheon?
>
> A.     I was asked to do something very different in Ratheon. I was asked to be a rebuttal witness and rebuttal expert to the damages expert for plaintiff in the case.

(Pl. Ex. 3 66:25-67:13.)

Putting aside for the moment Dr. Gompers' track record on appearing in cases to argue an "inefficient market," his opinion in this case cannot be admitted.  Defendants have answered the operative complaint and admitted that the market for BMS stock was efficient.  Defendants, in their Answer, admitted the following:

> 25.     At all relevant times, the market for BMS common stock was an efficient market for the following reasons, among others:
>
> (a)     BMS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;
>
> (b)     As a regulated issuer, BMS was required to and did file periodic reports with the SEC and the NYSE;
>
> (c)     BMS regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d)     BMS was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.
>
> 25.     Admit the averments in paragraph 25, except do not admit any reasons not specifically listed in paragraph 25(a) – (d).

(PX 1 ¶ 25.)

Defendants' answer constitutes an admission of the facts alleged in those averments. Accordingly, Defendants cannot proffer expert or other testimony to raise an issue that the market for BMS stock was not efficient.  See, e.g, Meschino v. North Am. Drager, Inc., 841 F.2d 429, 435-436 (1st Cir. 1988) (admission of a supplier of an anesthesia machine in its answer that it sold the machine to the hospital precluded the patient from having to prove that the supplier had been the seller of the machine).

In addition, Dr. Gompers' analysis itself is flawed.  During his deposition, Dr. Gompers testified concerning his Exhibit 43, and section 7.4.5 of his report, which purportedly shows BMS market inefficiency by tracking Imclone stock price movements and BMS value changes. Since BMS owned a 19.9 percent stock in Imclone, Dr. Gompers looked at trading days "in which there was a statistically significant stock price movement in the Imclone stock price." (Pl. Ex. 3 251:10-12.)  He then compared the movement in the Imclone stock price to the "percentage change in the Bristol stock price." (Pl. Ex. 3 251:16-18.)  Dr. Gompers explained:

> Q.     And what conclusions, if any, did you draw from this exhibit?
>
> A.     What you see is that by and large Bristol and ImClone are moving in the same direction.  One would expect that.  If I own – if I own a particular piece of something that's moving up and down in value, my stock price and my value is going to be affected by that move in value.  But what we see is that the stock price moves by too much.

(Pl. Ex. 3 252:2-12.)

From this, Dr. Gompers concluded that the market for BMS stock was not efficient. However, his analysis is incorrect.  He testified that of the eight entries set forth in Exhibit 43, seven of the eight percentages listed under the BMS return column were not statistically significant.  (Pl. Ex. 3 254:17-23.)  Accordingly, those seven are not statistically different from zero, and cannot provide any support for Dr. Gompers' analysis.  The only entry that is

statistically significant is the entry for January 24, 2002, which shows a -5.12% return for BMS. But on that date, BMS's stock was impacted by a fact unrelated to ImClone; on that date, BMS issued its earnings announcement, which Dr. Gompers had not considered.  (Pl. Ex. 3 257:12-259:7.)

Dr. Gompers also acknowledged that in his report that market efficiency is determined by the standards set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).  See also Gompers Report ¶ 84; Gompers Dep. 263:13-14 ("Many courts have looked at the common factors as a basis for market efficiency.").  Of the five factors delineated by Cammer, 711 F. Supp. at 1286-87, Dr. Gompers testified that the only factors not present in this case, in his opinion, was the existence of market makers and arbitrageurs.  (Pl. Ex. 3 263:15-264:14.)  He testified that his case met the other four Cammer factors.  (Pl. Ex. 3 265:11-13.)

However, this Cammer factor identified by Gompers – market makers and arbitrageurs – is more appropriate to over-the-counter stocks, which were at issue in Cammer, 711 F. Supp. at 1271, rather than national secondary markets, such as the New York Stock Exchange, which is at issue here. "[A]" well-developed and impersonal market, such as the New York or Pacific stock exchanges, will instantaneously incorporate all publicly available information about a given security into the market price of that security." Deutschman v. Beneficial Corp., 132 F.R.D. 359, 368 (D. Del. 1990)

Finally, as Dr. Gompers admitted during his deposition, he applied an "I'm right and everyone else is wrong" subjective analysis to market efficiency.  He testified that whenever a stock price drop is greater than he believes it should be, the market is inefficient.

> Q.     Well, if you use the methodology that you've described and you determined that the appropriate stock price drop was X but in reality it was a materially larger amount that we'll call Y, is it your opinion that X is correct and Y is irrational?

* * *

> A.      If I can't find other factors which would explain the stock
> market deviation and I found that that was a consistent pattern in
> the stock price, I would then conclude that those stock market
> reactions were overreactions and irrational.

(Pl. Ex. 3 227:4-16.)

Defendants' admission of market efficiency, Dr. Gompers' flawed methodology and his

subjective conclusions all require that the Court strike Dr. Gompers' opinions related to market

efficiency[3].

## VI.      The "Background" Portion of Dr. Cornell's Report Must be Excluded

Dr. Cornell testified that portions of his expert report were "general background material"

as to which he does not claim special expertise.  (Pl. Ex. 2 18:7-19:3.)  That background material

must be excluded from his expert report, testimony and summary judgment record.  Specifically

he testified as follows:

• As to paragraphs 21 through 30 of his report, titled "Background," he does not

claim expertise.  (DX 12 ¶¶ 21-30.)  It is "[a] background for the reader and a background for

me."  (Pl. Ex. 2 72:15-74:15.)

> Q.      [A]m I correct in understanding then that that section is
> background for you and the reader and it's not your expert
> opinion.…

* * *

> A.      That's the way I would characterize it.

(Pl. Ex. 2 73:15-73:22.)

---

[3]      Dr. Gompers' arguments concerning damages (DX 14 ¶¶ 136-74.) rely, in large part, on the opinions reached in the prior sections of his report challenged herein.  Accordingly, these paragraphs should be stricken for the reasons set forth above.  Dr. Gompers' analysis of the Expert Reports of Dr. Michael J. Barclay and Frank Torchio will be addressed further in Lead Plaintiff's opposition to Defendants' motion to strike those reports.

- When asked the basis for his statement at paragraph 27 of his expert report, that BMS believed the benefits of Vanlev outweighed the risk, (DX 12 ¶ 27.), Dr. Cornell testified that he took it from a BMS press release.  (Pl. Ex. 2 74:9-15.)

- The basis for his statement at paragraph 23 of his expert report that a "small percentage of [patients in the Vanlev clinical development program] (0.6%) had experienced the adverse event of angioedema" (DX 12 ¶ 23.) is "from general experience as a layman." (Pl. Ex. 2 69:10-21.)

- He could not explain his statement at paragraph 25 of his expert report that BMS decided not to disclose the OCTAVE results in an effort to protect the integrity of the NDA review because it was a BMS statement that he took from a press release.  (DX 12 ¶ 25.) (Pl. Ex. 2 71:2-24.)

- He has no expertise regarding his statement at paragraph 26 of his expert report that OVERTURE was the largest trial ever conducted on an experimental drug to treat heart failure patients.  The statement was taken from a BMS document.  (Pl. Ex. 2 71:25-72:22.) (DX 12 ¶ 26.)

- As to paragraphs 31 and 32 in the section titled "Risks of Common Stock in Pharmaceutical Industry" he claims no expertise in the practice of the pharmaceutical industry and R&D, as opposed to the references to the stock market.  (DX 12 ¶¶ 31-32.)  (Pl. Ex. 2 90:23-91:15.)

- He claims no expertise as to the portions of paragraphs 33 through 36 in the section of his report titled "R&D Risks."  He has no expertise in IRB's, IND's or R&D risk. (Pl. Ex. 90:9-22.)  (DX 12 ¶¶ 33-36.)

- Exhibit 4 to his expert report is a chart that he got off of the FDA website that he includes as background.  He claims no expertise in the new drug development process.  (DX 12 Exh. 4.)  (Pl. Ex. 2 92:16-93:2.)

- The section of his expert report captioned "Regulatory Risk," comprising paragraphs 37-41, are included as background and he claims no expertise as to their content. (DX 12 ¶¶ 37-41.)  (Pl. Ex. 2 94:12-17.)

- He has no expert basis for his statement at paragraph 39 that the FDA's decision to approve an NDA can be affected by the political climate.  (DX 12 ¶ 39.)  (Pl. Ex. 2 98:19-99:2.)

- Paragraphs 42-43 ("Investor Sentiment Risk") and 44-45 ("Disclosure of Product Development Risks by BMS") are general background sections that Dr. Cornell does not consider to be part of his expert opinion.  (DX 12 ¶¶ 42-45.)  (Pl. Ex. 2 104:19-105:23.)

All of the above described material must be excluded from Dr. Cornell's testimony to the jury.  He admits he has no expertise in these matters.

## VII.  Dr. Cornell's Opinion on the Economic Incentives of Securities Fraud in this Case Must Be Excluded

Dr. Cornell opines that economic incentive to engage in fraud depends on the benefits the perpetrators could hope to achieve if the fraud succeeds and the probability that the fraud will be detected before the benefits will be earned.  He opines that in this case neither BMS nor the individual defendants received any economic benefit from inflating the stock during the Class Periods.  Dr. Cornell concludes that there was no economic incentive to commit fraud.  (DX 12 ¶¶ 46-67.)

Dr. Cornell's opinion must be excluded for these reasons.  His opinion is not reliable given that it is not based on accepted methodology, and he did not consider important relevant facts in arriving at his opinion.

In this litigation, Dr. Cornell applied economic theory to predict motivation to engage in fraud.  (DX 12 ¶¶ 46-47.)  Dr. Cornell testified that the model is based on a fundamental economic theory of weighing risks against benefits.  According to Dr. Cornell, the theory has been used to analyze basic decisions like marriage, divorce and getting an education.  In this case, Dr. Cornell is "developing an economic model of the motivation to engage in fraud." (Pl. Ex. 2 108:15-19.)  While the theory has been used in other situations, such as predicting marriage, he is not aware of application of this theory to predict securities fraud.  He is unaware of any literature written on the model of using economic theory to predict securities fraud. (Pl. Ex. 2 108:25-109:17.)  He does not recall ever seeing or hearing of anyone using economic theory to predict motivation to commit securities fraud.  (Pl. Ex. 2 110:2-7.)  He acknowledged that it was possible that he was the first one ever to use economic theory to predict securities fraud.[4]  (Pl. Ex. 2 109:18-110:7.)

Dr. Cornell's application of economic theory to predict motivation in a securities fraud case is, according to his testimony, a novel and untried approach.  It is untested, unverified, and not peer-group validated in this context.  The model that he formulated for purposes of this litigation does not enjoy general acceptance within a scientific community.  Daubert requires exclusion of Dr. Cornell's use of his economic theory to predict motivation to commit securities fraud in this case.

---

[4]    Dr. Cornell said he doubted whether he was the first to apply the theory to securities fraud, but he could not remember ever hearing or reading about it having been done before.  (Pl. Ex. 2 109:18-110:7.)

**VIII.   In Performing His Analysis Dr. Cornell
Did Not Consider Relevant Information**

As part of his analysis that there was no motivation to commit securities fraud in this case, Dr. Cornell opined that the individual defendants did not receive any economic benefit from the alleged fraud.  His expert report states that defendants Heimbold and Ringrose sold stock and received proceeds of nearly $60 million.  He also said that these transactions were not stock sales, but surrenders of stocks for payment of exercise price and/or tax liability upon exercising stock options.  (DX 12 ¶ 59.)  Dr. Cornell concluded that those defendants did not receive economic benefit.

When asked whether using the $60 million proceeds to pay a liability that would otherwise have to be paid with other cash was not, in effect, a cash savings, Dr. Cornell agreed that it was.  He said he was "particularly hazy" on the details of this aspect of his expert report.  (Pl. Ex. 2 118:16-120:2.)

Common sense tells us that selling stock to get $60 million to pay a liability is economic incentive.  Dr. Cornell's failure to consider relevant factors makes his opinion that the individual defendants did not derive economic benefit from the fraud unreliable, and requires its exclusion.

**IX.   Dr. Cornell's Statement That BMS Did Not
Conceal The Side Effects Of Vanlev Must Be Excluded**

Dr. Cornell states in his expert report:  "In fact, Bristol-Myers did not conceal the side effects of Vanlev from the market or the analysts."  (DX 12 ¶ 74.)  The basis for his opinion is statements made at the AHA meeting, and the fact that those statements were thereafter reported in the financial press.  (Pl. Ex. 2 124:20-128:2.)  He was unaware, however, of the following:

- that FDA reviewers found that the incidence of angioedema with Vanlev was fourteen times greater than it was with a placebo;

- that the FDA found that the incidence of angioedema was five times greater with Vanlev than with amlodipine or lisinopril;

- that the FDA epidemiologist concluded that the incidence of angioedema leading to airway intervention or hypoxic death in the omapatrilat NDA was at least sixfold higher than with other ACE inhibitors;

- that the FDA's finding supported the hypothesis that omapatrilat had an unfavorable risk of clinically severe angioedema in comparison to other ACE inhibitors;

- that the FDA said that according to Dr. Brinker's estimate, the rate of serious risk of angioedema in Vanlev is some fifty to a hundredfold higher than the reported rate of post-marketing cases for all ACE inhibitors combined;

- that when BMS calculated the incidence of angioedema with Vanlev in the pre-Octave clinical trials, they included cases reported by investigators as angioedema, but did not include cases reported as head or neck edema;

- that the FDA said that if head and neck edema were added into the incidence of angioedema in patients taking omapatrilat in the pre-Octave clinical trials, that the incidence of angioedema would be at least three times the incidence of angioedema with other ACE inhibitors in other clinical trials;

- that there were at least ten hospitalizations in the pre-Octave clinical trials of patients who took omapatrilat;

- that there were other cases of life-threatening angioedema or airway compromise in addition to the four cases of airway compromise disclosed at the AHA; and

- that BMS sent a letter to Australian investigators reported twenty serious cases of angioedema, nine of which were life-threatening, including the four cases of airway compromise.

(Pl Ex. 2 128:11-2140:24.)

Dr. Cornell testified that he did not recall seeing this information when he wrote his report, and he was not aware of any information that would lead him to believe that the foregoing information had been disclosed to analysts or the market.  (Pl. Ex. 2 128:11-140:24.)  His opinion that BMS did not conceal the side effects of Vanlev is beyond the scope of his expertise, based on incomplete information and must be excluded.

## X.     Either Dr. Gompers or Dr. Cornell Should Be Precluded From Offering Their Expert Opinions Because They Are Entirely Cumulative and Repetitive

Defendants designated two expert witnesses Dr. Gompers and Dr. Cornell to offer repetitive and cumulative opinions in the area of damages.  Because such repetitive testimony is a classic example of needlessly cumulative, time-wasting and unfairly prejudicial evidence, Defendants should be required to choose one expert to testify about these matters.

In In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 746 (3d Cir. 1994), the Third Circuit reaffirmed that "under Rule 702, admissibility of scientific testimony turns not only on reliability but also on the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury;" and that Rule 702 partly incorporates Rule 403 analysis with respect to experts.  See also Planned Parenthood v. Verniero, 22 F. Supp. 2d 331, 338-43 (D.N.J. 1998)(Hughes, M.J.) (excluding 10 of defendants' 14 expert witnesses as irrelevant, unnecessary and cumulative pursuant to Fed. R. Evid. 402, 403, 611 and Fed. R. Civ. P. 1 and 16).

> Multiple expert witnesses expressing the same opinions on a subject *is a waste of time and needlessly cumulative.*  It also raises the possibility that jurors will resolve competing expert testimony by *"counting heads"* rather than evaluating the quality and credibility of the testimony.

Sunstar, Inc. v. Alberto-Culver Co., No. 01 C 0736, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004) (emphasis added).

## <u>CONCLUSION</u>

For the reasons set forth above, Lead Plaintiff respectfully requests that the Court grant the instant motion to preclude the challenged testimony from being offered to the jury or in support of Defendants' motion for summary judgment.

Dated: May 13, 2005

LITE DEPALMA GREENBERG
& RIVAS, LLC

By: _____
    Allyn Z. Lite (AL-6774)
    Joseph J. DePalma (JD-7697)
Two Gateway Center
Newark, New Jersey  07102
(973) 623-3000

Liaison Counsel for Lead Plaintiff and the
Class

GOODKIND LABATON RUDOFF
& SUCHAROW LLP
Thomas A. Dubbs
James W. Johnson
Nicole M. Zeiss
100 Park Avenue
New York, New York  10017
(212) 907-0700

Lead Counsel for Lead Plaintiff and the
Class