**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
IN RE BRISTOL-MYERS SQUIBB          :       Civil Action No. 00-1990 (SRC)
SECURITIES LITIGATION                    :
                                                  :       Return Date: June 6, 2005
                                                  :       Oral Argument Requested
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO STRIKE**
**THE EXPERT TESTIMONY OF ROBERT UHL**

**LITE DEPALMA GREENBERG & RIVAS, LLC**
Allyn Z. Lite (AL 6774)
Joseph J. DePalma (JD 7697)
Michael E. Patunas (MP 2306)
Two Gateway Center, 12th Floor
Newark, New Jersey  07102
(973) 623-3000

Liaison Counsel for Lead Plaintiff and the Class

**GOODKIND LABATON RUDOFF & SUCHAROW LLP**
Thomas A. Dubbs
James W. Johnson
Nicole M. Zeiss
100 Park Avenue
New York, New York  10017
(212) 907-0700

Lead Counsel for Lead Plaintiff and the Class

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 1

ARGUMENT .................................................................................................................... 3

    I.     Legal Standards Governing Admission Of Expert Testimony ........................ 3

    II.    Mr. Uhl Is Qualified to Render the Opinions He Has Testified About .......................... 4

          A.   Mr. Uhl's Background and Professional Experience ............................... 5

    III.   Mr. Uhl's Testimony Is Reliable ...................................................................... 9

          A.   Opinions Regarding Materiality of OCTAVE and  OVERTURE
              Information .............................................................................................. 11

          B.   Opinions Regarding Severity and Incidence of Vanlev's
              Angioedema ............................................................................................ 14

          C.   Mr. Uhl's Opinions Concerning NYSE Listing Requirements ............. 16

    IV.   Mr. Uhl's Testimony Meets the "Fit" Requirement And Should Be
        Admitted ............................................................................................................ 16

          A.   Opinions on Materiality ......................................................................... 17

          B.   Opinions On Whether Information About the Incidence or Severity
              of Vanlev's Angioedema Were Absorbed By the Marketplace and
              Reflected in BMS Stock Price ............................................................... 18

          C.   Opinions Concerning the NYSE Listing Requirements ........................ 18

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997) ........................................................................................... 13

Crowley v. Chait,
    322 F. Supp. 2d 530 (D.N.J. 2004) ................................................................................... 10

Daubert v. Merrell Dow Pharms., Inc.,
    509 U.S. 579 (1993) ..................................................................................................... 3, 4, 9

Elcock v. Kmart Corp.,
    233 F.3d 734 (3d. Cir.2000) ................................................................................................ 4

FDIC v. Refco Group, Ltd.,
    184 F.R.D. 623 (D. Col. 1999) ......................................................................................... 18

GSC Partners CDO Fund v. Washington,
    368 F.3d 228 (3d Cir. 2004) ....................................................................................... 18, 19

General Elec. Co. v. Joiner,
    522 U.S. 136 (1997) ......................................................................................................... 3, 9

Holbrook v. Lykes Bros. Steamship Co., Inc.,
    80 F.3d 777 (3d Cir.1996) ................................................................................................... 4

Knight v. Otis Elevator Co.,
    596 F.2d 84 (3rd Cir. 1979) ................................................................................................ 5

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999) ......................................................................................................... 3, 9

Lillis v. Lehigh Valley Hosp., Inc.,
    No. 97-3459, 1999 WL. 718231 (E.D. Pa. Sept. 3, 1999),
    aff'd, 251 F.3d 154 (3d Cir. 2000) ............................................................................... 5, 10

In re Nice Sys.,  Ltd. Sec. Litig.,
    135 F. Supp. 2d 551 (D.N.J. 2001) .................................................................................. 19

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000) ............................................................................................. 19

Oran v. Stafford,
    226 F.3d 275 (3d Cir. 2000) ............................................................................................. 13

Parkinson v. Guidant Corp.,
   315 F. Supp. 2d 754 (W.D.Pa. 2004) ...........................................................................5

Schneider v. Fried,
   320 F.3d 396 (3d Cir. 2003) ..................................................................................3, 10

Taylor v. Danek Medical, Inc.,
   No. 95-7232, 1999 WL. 310647 (E.D. Pa. May 10, 1999) ...............................10, 13

In re WorldCom, Inc. Sec. Litig.,
   No. 02-3288 (SDNY) ...............................................................................................17

## STATUTES

Fed. R. Evid. 702 ...............................................................................................1, 3, 9, 16

Fed. R. Evid. 702, advisory committee note (2000) .........................................................9

## OTHER AUTHORITIES

4 J. Weinstein & M. Berger, Weinstein's Federal Evidence,
   702.03[2][b] (2d ed. 2005) ......................................................................................17

4 J. Weinstein & M. Berger, Weinstein's Federal Evidence,
   704.04[2][c] (2d ed. 2005) ......................................................................................17

## INTERNET

Series 7, available at, http://www.nyse.com/pdfs/series7.pdf .......................................6

Series 7 Regulation, available at,
   http://www.nyse.com/regulation/qualexamsconted/1089312755548.html...............6

Series 24, available at, http://www.nasd.com/web/groups/corp_comm/
   documents/home_page/nasdw_011078.pdf ..............................................................7

Series 86, 87 Regulation, available at, http://www.nasd.com/web/
   idcplg?IdcService=SS_GET_PAGE&ssDocName= NASDW_
   011051&ssSourceNodeId=759 .................................................................................7

**PRELIMINARY STATEMENT**

Lead Plaintiff, the LongView Collective Investment Fund ("Lead Plaintiff"), respectfully submits this memorandum of law in opposition to defendants' motion to strike, pursuant to Rule 702 of the Federal Rules of Evidence, the testimony of Lead Plaintiff's market issues expert, Mr. Robert H. Uhl.  Defendant Bristol-Myers Squibb ("BMS" or the "Company"), along with individual defendants Charles A. Heimbold ("Heimbold"), Peter R. Dolan ("Dolan") and Peter S. Ringrose ("Ringrose") (collectively, "Defendants"), have moved for this relief.[1]  Although Defendants fashion their motion as one seeking to strike Mr. Uhl's report and testimony in its entirety, in fact only portions of his expert opinions are being challenged. Accordingly, Mr. Uhl should not be precluded from testifying in this action and, in addition, the challenged portions of his report should not be stricken, for the reasons discussed herein.

**STATEMENT OF FACTS**

In light of the recent submission of papers in support and opposition to Defendants' motion for summary judgment and the Court's August 30, 2004 opinion, familiarity with the facts underlying the claims is presumed.

---

[1] Lead Plaintiff's expert reports were submitted as exhibits 12-19 to the Declaration of James W. Johnson, Esq. in Opposition to Defendants' Motion for Summary Judgment, dated February 4, 2005. To the extent any exhibits cited herein were submitted in support of or opposition to Defendants' summary judgment motion, they will be referred to as either "PX" or "DX" and will bear their original summary judgment reference number.  Any new exhibits, which were not submitted either in support of or opposition to Defendants' summary judgment motion, are being submitted herewith as exhibits to the Declaration of James W. Johnson In Opposition to Defendants' Motions To Strike The Expert Testimony of Lead Plaintiff's Expert Witnesses, dated May 23, 2005 ("Johnson Opp. Decl."), and are referred to as "Pl. Opp. Ex. ___."

References to exhibits attached to the Declaration of Elissa Meth in Support of the Motions to Strike the Testimony of Michael J. Barclay, Jonathan L. Benumof, Allan S. Detsky, Robert C. Nelson, Paul D. Stolley, Frank C. Torchio and Robert H. Uhl, dated May 13, 2005, will be referred to as ("Meth Ex.").

Mr. Uhl submitted an expert report in this matter which explains and opines on several subjects.  First, he testifies regarding how information is disseminated about publicly traded companies, the role of investor relations departments and analysts, and industry practices of pharmaceutical analysts. Defendants do not challenge these aspects of Mr. Uhl's proffered testimony.

Second, he testifies about the market's consensus regarding the angioedema seen with Vanlev, which included: (1) industry interpretation of the phrases "airway compromise," "some form of hospitalization or special treatment"; (2) use of words "intubation" and "tracheostomy" in public reports; (3) materiality of angioedema with Vanlev; and (4) whether certain information was absorbed by the market and reflected in price of BMS securities.  Defendants do not challenge portions of this expert testimony, including that the occurrence of the four intubation events was material. See Memorandum of Law in Support of Defendants' Motion to Strike the Expert Testimony of Robert H. Uhl, pages 8-12 ("Def. Mem. at ___").

Third, Mr. Uhl testifies about the materiality of aspects of OCTAVE and OVERTURE, based on certain assumptions regarding matters that are beyond the scope of his expertise. Defendants do not challenge portions of this expert testimony, such as the materiality of the intubation that occurred in OCTAVE in February 2001 or his evaluation of analysts' consensus. (Def. Mem. at 5-6.)

Lastly, he explains that there are New York Stock Exchange ("NYSE") "listing" requirements that require companies listed with the NYSE to make certain disclosures, among other things, and opines on the reasonableness of BMS's announcements given the listing requirements.  Defendants contest the entirety of these opinions. (Def. Mem. at 12-14.)

## ARGUMENT

I.      **Legal Standards Governing Admission Of Expert Testimony**

Rule 702 of the Federal Rules of Evidence govern the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The rule was amended in 2000 in response to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and to the many cases applying Daubert, including Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and General Elec. Co. v. Joiner, 522 U.S. 136, 140 (1997).  More recently, in Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003), the Third Circuit described these requirements as the "trilogy of restrictions on expert testimony: qualification, reliability and fit."

Here, Mr. Uhl's report and testimony meet these standards.  He should not be precluded from testifying to certain matters in this action, because he possesses sufficient knowledge, skill, experience, training or education in the field of securities market analysis, and is therefore competent to testify to certain matters under Fed. R. Evid. 702.  His opinion is reliable, given that it is based on reliable methodologies used regularly by securities analysts and is supported by accepted standards of industry practice within that field and derived from a reasoned factual basis and supporting data.  The challenged testimony does not invade the province of the jury and would "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by Rule 702.  Therefore, it should be admitted.

## II.   Mr. Uhl Is Qualified to Render the Opinions He Has Testified About

Defendants acknowledge that Mr. Uhl has general expertise as a pharmaceutical analyst. (Def. Mem. at 2.)  However, in moving to preclude admission of his testimony in this action, they urge the Court to require that he have specialized expertise in not just equities analysis, but also in "medical determinations about angioedema," emergency medicine, cardiology, angioedema, "factual and/or forensic financial assessments" about what investors knew or BMS's stock price, securities regulation, the determination of materiality, and legal and regulatory matters. (Def. Mem. at 3, 6, 9.)  This is a ridiculous standard that has no support in the case law.  The Third Circuit has interpreted the qualification requirement for an expert more practically than Defendants.

In Elcock v. Kmart Corp., 233 F.3d 734 (3d. Cir. 2000), the Third Circuit re-affirmed the standard for qualifying as an expert:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony.  The basis of this specialized knowledge "can be practical experience as well as academic training and credentials."  We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts."

Id. at 741 (citations omitted) (emphasis added).

In Holbrook v. Lykes Bros. Steamship Co., 80 F.3d 777, 782 (3d Cir.1996), the Third Circuit reversed the district court's exclusion of the plaintiff's treating physician's diagnosis of mesothelioma; the district court excluded the testimony on the grounds that the physician was not a "pathologist, oncologist or expert in 'definitive cancer diagnosis'."  The Third Circuit stated that the district court had construed the qualifications requirement too narrowly, and that the issue was ripe for exploration on cross-examination but not for Daubert exclusion, holding that:

> [b]ecause of our liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility. Thus, witnesses may be competent to testify as experts even though they may not, in the court's eyes, be the 'best' qualified. Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree. . . .[I]nsistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area. . . .[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.

Id. at 782.  See also Knight v. Otis Elevator Co., 596 F.2d 84, 88 (3d Cir. 1979) (Third Circuit was reluctant "to require highly particularized, sub-specialization on the part of experts."); Lillis v. Lehigh Valley Hosp., Inc., No. 97-3459, 1999 WL 718231, at *6 (E.D. Pa. Sept. 3, 1999) ("It is not for us to require that proponents of expert testimony provide witnesses with the qualifications that match a perfect fit to the issues presented. In fact, it would have been an abuse of discretion to do so."), aff'd, 251 F.3d 154 (3d Cir. 2000).

"The Third Circuit has made clear that a broad range of knowledge, skills, and training qualify an expert as such and has eschewed imposing overly rigorous requirements of expertise." Parkinson v. Guidant Corp., 315 F. Supp. 2d 754, 758 (W.D. Pa. 2004) (factors such as training or experience with a specific aspect of a scientific field go to the weight, not admissibility, of an expert's testimony).

### A.    Mr. Uhl's Background and Professional Experience

Mr. Uhl was designated by Lead Plaintiff as an expert in equities market issues and asked to opine on matters concerning pharmaceutical equities, specifically BMS stock, and the analysis of such equities by the investing community.  (PX 19 at 1-2.)  These matters are within his area of expertise.  He has been a securities analyst, and supervised other analysts, for over twenty years for companies such as Salomon Brothers, Salomon Smith Barney, Leerink Swann &

Company and Wells Fargo.[2] (PX 19, Ex. A.)  Throughout his career he has specialized in

analyzing or "covering" pharmaceutical companies, including large pharmaceutical companies

("big cap")[3] such as BMS, Merck and Pfizer, "specialty pharmaceutical" and biotechnology

companies. (PX 19, Ex. A; Meth Ex. 8 26:10-28:7, 78:16-80:22.)  His duties and responsibilities

have included: writing research reports; preparing financial models; making investment

recommendations; communicating with institutional clients; communicating with companies and

their investor relations departments; reading trade journals; and attending medical conferences.

(Meth Ex. 8 13:6-14:16, 15:3-16:6, 16:15-23, 18:9-22; PX 19 at 2-3.)

    With respect to his education, Mr. Uhl has a Bachelor of Science degree in microbiology,

a Masters degree in International Business and Strategic Market Planning, and some post-

graduate (non-degree) work in immunology. (PX 19, Ex. A.)  He is currently registered and

licensed by the National Association of Securities Dealers ("NASD"), after having taken

examinations required by regulation. (PX 19, Ex. A.) The Series 7 registration, which is required

and administered by the NYSE, authorizes and qualifies Mr. Uhl "for the solicitation, purchase,

and/or sale of all securities products, including corporate securities, municipal securities,

municipal fund securities, options, direct participation programs, investment company products,

and variable contracts." See http://www.nyse.com/pdfs/ series7.pdf; http://www.nyse.com/

regulation/qualexamsconted/1089312755548.html (last visited May 19, 2005).  The Series 24

---

[2] In 1994, he ran his own fund and also was an investor relations consultant to a small
company in Raleigh, North Carolina. (Meth Ex. 8 19:5-17; PX 19, Ex. A.)

[3] Mr. Uhl explained at his deposition that companies in the pharmaceutical industry can be
categorized by size or focus. (Meth Ex. 8 76:2-78-11.)  The "specialty" pharmaceutical sector
includes drug development companies, generic drug companies and smaller specialty marketing
firms. (Meth Ex. 8 12:25-13:5.)  Biotechnology companies deal with therapeutic agents that are
protein based.  For purposes of qualifying as an expert in this action, there is no meaningful
distinction between Mr. Uhl's experience covering "specialty" pharmaceuticals as opposed to
"big cap" pharmaceuticals, nor have Defendants explained why there is one. (Def. Mem. at 1.)

registration authorizes and qualifies him to supervise others.  See http://www.nasd.com/web/ groups/corp_comm/documents/home _page/nasdw_011078.pdf.  The Series 63 registration covers the principles of state securities regulation reflected in the Uniform Securities Act.  The Series 86 and 87 registrations test fundamental analysis and valuation of equity securities as well as knowledge of NASD and NYSE rules, the Securities Act of 1933 and the Securities Exchange Act of 1934 for individuals who produce communications that analyze equity securities or individual companies/industry sectors and provide information that could be the basis of investment decisions. (Meth Ex. 8 30:19-31:23); see also http://www.nasd.com/web/ idcplg?IdcService=SS _GET_PAGE&ssDocName= NASDW_011051&ssSourceNodeId=759 (last visited May 19, 2005).  The examinations leading to these registrations all involved coursework on securities regulation and materiality within the meaning of securities laws, among other things. (Meth Ex. 8 33:4-13, 57:2-6.)

As part of his responsibilities as a pharmaceutical analyst, Mr. Uhl regularly attends medical seminars and plenary sessions, such as those held by the American College of Cardiology ("ACC") and the American Heart Association ("AHA"), which are in fact continuing medical education courses for physicians and healthcare professionals. (PX 19 at 3; Meth Ex. 8 31:24-32:21.)  He also explained that his 23 years of experience have given him an extensive knowledge base[4] in FDA procedure, drug development and medical terminology. (PX 19 at 3, 5-6; Meth 8 33:14-20.)

---

[4] The testimony from Mr. Uhl's deposition cited by Defendants at page 10 of their memorandum of law is taken out of context.  His answer is part of a series of questions and answers about what analyst Barbara Ryan's consultants thought about the intubations and does not reflect an assessment of his general medical knowledge. (Meth Ex. 8 188:17-191:24; Pl. Opp. Ex. 8.)

When Mr. Uhl was asked whether he considered himself an expert[5] in any field, he responded that he is an expert in "the analysis of pharmaceutical firms and all that that entails." (Meth Ex. 8 35:15-36:14.)  Specifically, he testified:

> I have extensive expertise in the analysis of other companies, as well, and expertise in knowing how these companies communicate with the investment community; I have expertise in how analysts, you know, develop models and develop opinions about an investment; as a result of following the pharmaceutical industry for an extensive period of time, I have expertise in knowing the FDA requirements and the pathways to getting a new drug approved; I have expertise in various types of drug side effects and the problems that can crop up in clinical development, having, you know, followed the experience of dozens of companies over the course of my career.

(Meth Ex. 8 35:24-36:14, 33:4-20.)[6]

In light of this extensive experience and training, much greater than that possessed by the average lay person, Mr. Uhl, as a securities analyst who deals with these issues on a professional basis, was qualified to consider and opine on: whether information related to OCTAVE and OVERTURE was material in that it would be considered significant by analysts and a reasonable investor as altering information known about Vanlev; whether certain information with Vanlev was known to the market or reflected in the price of BMS's securities; what the market consensus was about BMS and Vanlev; and whether BMS disclosures were in compliance with NYSE disclosure regulations as set forth in the listing requirements.

---

[5] Mr. Uhl's testimony concerning his personal definition of "expert" is irrelevant to this Court's determination, which is instead guided by the Third Circuit and the courts within this circuit.

[6] He also explained that while he does not consider himself an expert in the subject of securities regulation, he has sufficient knowledge to perform his job effectively. (Meth Ex. 8 56:10-14.)

Defendants state that a heightened level of qualification was required for these assessments, but they do not explain why. (Def. Mem. at 6, 9, 12)  Mr. Uhl has not been offered as a damages expert or been asked to calculate any artificial inflation in BMS's stock.  He is not being offered as an airway management expert.  He is also similarly, if not more, qualified to render these opinions as Defendants' market expert, who has offered testimony based upon her experience and training as a securities analyst. (DX 16.)  An analyst, such as Mr. Uhl, with over twenty years experience in evaluating public information about pharmaceutical companies, determining the market's consensus on issues (particularly medical issues) and assessing any potential impact of that information on a security has the training, knowledge and skill to opine in the areas he was asked to opine on.

Mr. Uhl's expertise is derived from his practical and professional experience as well as his training, the propriety of which has been repeatedly approved of by the Third Circuit and courts within the Third Circuit.

### III.   Mr. Uhl's Testimony Is Reliable

The essential guidance learned from Daubert, Kumho Tire and Joiner is that an expert's testimony must be based upon sufficient facts and flow from the reliable application of sound reasoning or methods. Fed. R. Evid. 702.  Nothing in Fed. R. Evid. 702 "suggests that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a reliable basis for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  Fed. R. Evid. 702 Advisory Committee Notes; see also Kumho Tire, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

> The factors mentioned in Daubert . . .are not a hard test but rather a flexible inquiry into the overall reliability of a proffered expert's methodology. Therefore, we have 'considerable leeway' in deciding in each case 'how to go about determining whether particular expert testimony is reliable.' As the Third Circuit has suggested, the standard of reliability is not a high one. The main goal is to exclude so-called 'junk science' and ensure that expert testimony is based on sound methods and valid procedures.

Lehigh Valley Hospital, Inc., 1999 WL 718231, at *6 (expert appropriately testified about protocols, policies and procedures of defendant hospital despite qualification and reliability challenges). See also Schneider, 320 F.3d at 406 ("we note that expert testimony does not have to obtain general acceptance or be subject to peer review to be admitted under Rule 702." "Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point.")

Here, Mr. Uhl's testimony is reliable, because he arrived at his conclusions by using standard industry practices[7] that he has used in his professional capacity for over twenty years. He also followed the same practices that Defendants' market issues expert, Mary Ann Gray, used in evaluating his opinions. (DX 16 ¶10, 14, 16, 18, 21-24.) The fact that Mr. Uhl did qualitative[8], as opposed to a quantitative, analyses does not fundamentally undermine the reliability of his opinions and Defendants have cited no support for the proposition that it does. Taylor v. Danek Medical, Inc., No. 95-7232, 1999 WL 310647, at *2 (E.D. Pa. May 10, 1999)

---

[7] In Crowley v. Chait, 322 F. Supp. 2d 530, 541-542 (D.N.J. 2004), the court rejected the "contention[] that this methodology was unsound simply because it relied upon no reported or published methodology. Given [expert's] extensive experience in the field of underwriting, his assertion that he and his staff applied industry standards suffices. 'In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.' Fed. R. Evid. 702, advisory committee note (2000)."

[8] This is precisely the type of analysis that Defendants' market expert, Mary Ann Gray, was asked to do. (Meth Ex. 8 193:12-17.)

("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means" of challenging contested evidence.)

> **A.     Opinions Regarding Materiality of OCTAVE and OVERTURE Information**

Based upon a review of analyst reports from April 19, 2000 to the end of March 2002, and all of the depositions of analysts taken in this case, Mr. Uhl evaluated what the market's consensus was with respect to certain information in order to determine whether information about OCTAVE and OVERTURE was material to investors and the investment community, in that it would be considered by analysts and a reasonable investor as significantly altering the information made available by BMS concerning Vanlev.[9]  Evaluating and identifying significant information is what analysts do as part of their standard practices[10] and this is precisely what Mr. Uhl did here.

As was repeatedly asked and answered at his deposition, Mr. Uhl followed a methodology that is consistent with standard industry practice:

_____

[9] One of Defendants' two damages experts, Dr. Paul Gompers, has offered a similar definition, "In order for a given misstatement or omission to be material, a sophisticated investor must consider that information relevant for his stock investment decision." (DX 14 at 7.)

[10] As described by Mary Ann Gray, "every industry has associated with it a group of independent, private analysts, some of whom are affiliated with brokerage houses or investment banks, who track, report, and analyze information affecting the value of the companies in that industry. The pharmaceutical industry is no exception. Developments in the pharmaceutical industry are closely and continually watched by groups of one to six individuals at firms such as Morgan Stanley, Deutsche Banc Alex Brown, CIBC, Salomon Smith Barney, and others. Analysts use a variety of resources to predict events that will influence the prices of the stocks that they cover. Pharmaceutical analysts often use physician consultants and other experts to try to predict the success of pharmaceutical companies' products. These analysts disseminate reports that include their opinions on developments as they occur, as well as potential future events that may impact the value of companies. These reports help to ensure that all available public information is embedded in the prices of publicly traded stocks of pharmaceutical companies." (DX 16 ¶7)(emphasis added.)

Q.     In order to determine whether the information that you conclude is material was material, did you undertake to determine whether that information had an impact on earnings or earnings growth?

A.     Yes, I did.

Q.     And how did you do that?

A.     Well, I read dozens of analyst reports and got a feel for what their opinions were about -- in this case Vanlev and its sales and saw the way they were developing their models for the product and making their forecasts and the types of information that they were using to come up with those sales forecasts.  Then when additional information came out, they had changes to their forecast  based on that information.  Another thing I did was look at the testimony of some of the analysts who said that, yes, I would have wanted to know that information and it would have been important in formulating my opinion about the future of that product, and, you know, just knowing also from my experience in dealing with the pharmaceutical industry and investments for the past 23 years that, you know, certain information that I would have liked to have known or had or knowing how that might have impacted my own personal projections or forecast.

(Meth Ex. 8 104:23-106:11; see also Meth Ex. 8 91:11-107:15.)

When asked "to reduce to a simple statement the methodology by which one determines

materiality" Mr. Uhl explained:

A.     I can really only go back to what I said before.  It's my belief that . . .the most important determinant in a share price is the market's expectation for future earnings growth.  So it's not -- there's not some little cookbook method you that use to go out and find information that has an impact on that.  One tries to be open to information coming from all different sources and locations in order to, you know, figure out how -- you know, what the impact is on the earnings growth rate because that determines the price of an equity, for the most part.

(Meth Ex. 8 96:11-97:3.)

Mr. Uhl's review and evaluation was objective and could have been, indeed was, tested

by another expert in his field.  Defendants' expert Mary Ann Gray reviewed the same documents

12

as Mr. Uhl and came to her own determinations of materiality. (DX 16 ¶10, 13, 21-24; Ex. 2.)

The fact that Mr. Uhl and Ms. Gray disagree does not mean that Mr. Uhl's analysis and

evaluation were unreliable.  Their disagreement can be explored on cross-examination and

weighed by the trier-of-fact.  <u>Taylor</u>, 1999 WL 310647, at *2 ("Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are traditional

and appropriate means" of challenging contested evidence.)

 Contrary to Defendants' assertion that Mr. Uhl's assessment of materiality "requires an

examination of whether the information affects the stock price" (Def. Mem. 6-7)[11], material

omissions by their nature would not be expected to affect the price of a stock at the time they are

made and material information that is expected by the market would not affect the price of stock.

<u>See, e.g.</u>, Affidavit of Michael Barclay (PX 3); Cornell Dep. (Pl. Ex. 2 261:9-262:19); Gompers

Dep. (Pl. Ex. 3 111:5-114:18.)  It cannot be disputed that the information considered by Mr. Uhl

(September 2001 OCTAVE results, negative trends in angioedema during OCTAVE, reliance on

early stop for OVERTURE <u>et cetera</u>) are alleged to have not been disclosed to the market prior

to the March 20, 2002 disclosures that led to the BMS stock drop at issue in this action.  <u>See</u>

<u>generally</u> Lead Plaintiff's Statement Pursuant to Local Rule 56.1 ¶¶426-436, 442-475, 485-507

("Rule 56.1").

---

[11] The two cases cited by Defendants do not compel a different conclusion. <u>Oran v. Stafford</u>, 226 F.3d 275, 283 (3d Cir. 2000), held that statements were immaterial where their corrective disclosure "had no appreciable negative effect on the company's stock price."  Similarly, in <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1425 (3d Cir. 1997), the court considered a disclosure that had no stock drop.  In the present case, there was a stock drop when the alleged omissions were corrected on March 20, 2002 by the news of the OCTAVE and OVERTURE results. (Rule 56.1 ¶583-602.)

This notwithstanding, any purported failure on Mr. Uhl's part to perform an analysis that Defendants, in theory at least, believe is required goes to the weight, not the admissibility, of Mr. Uhl's testimony.[12]

Defendants' challenge to Mr. Uhl's underlying assumptions is premature and unnecessary. His report clearly states that he has made certain assumptions that may or may not be proved at trial. (PX 19 at 4-5.) It is up to the trier of fact, not Defendants in a <u>Daubert</u> motion, to determine if they are "false and unsupported."

### B.  Opinions Regarding Severity and Incidence of Vanlev's Angioedema

Defendants' primary challenge to the reliability of Mr. Uhl's opinions regarding what information about Vanlev's angioedema would have been reported by, and thus "known" to, the market and imbedded in BMS's stock price is that his methodology was imprecise and consisted of a review of documents and depositions and drawing on his expertise as a pharmaceutical analyst. (Def. Mem. at 10.) However, they fail to explain how his method of review and analysis was deficient or why a "forensic financial analysis" and event study is required for admission of the opinion. Again, Mr. Uhl did not opine on the amount of alleged inflation in BMS stock.[13] Indeed Defendants' own market expert, Mary Ann Gray, followed precisely the same process as Mr. Uhl in opining on the same matters. "I have reviewed analyst reports published during and prior to those periods to determine the extent and nature of the information about Vanlev that was available to prospective purchasers of BMS stock ("the market")." (DX 16 ¶10.) She also

---

[12] Defendants' own market expert, Mary Ann Gray, did not do any analysis of BMS stock prices in rendering her opinions on materiality. (DX 16).

[13] It reliably followed that if there was no market consensus or reporting of the intubations or higher incidence of angioedema <u>et cetera</u>, that information would not be reflected in the stock price.

came to conclusions about what the market did and did not know and what was absorbed into BMS's stock price.[14]  (See, e.g., DX 16 ¶2, 7, 11-16, 20-21, 23.)

Mr. Uhl followed a standard industry practice for determining what the market consensus was about Vanlev's angioedema and based his opinions on that reliable foundation.  This is not "reading the minds" of investors and analysts.  Any disagreement with his method can be explored on cross-examination.

The charge that his review was deficient because he did not look at "all of the relevant documents and deposition testimony" and that he "looked instead only at those analyst reports, press releases, deposition transcripts, and BMS conference call transcripts that were selected for him by counsel for plaintiffs" is a red herring. (Def. Mem. at 10.)  Defendants have not cited any documents that would fundamentally undermine the reliability of Mr. Uhl's opinions.  Over four million documents were produced in this litigation.  Mr. Uhl could not possibly have looked at all the relevant ones.  Instead, he looked at six boxes of documents which included, inter alia: (1) unedited audio tapes of all analyst conference calls produced by Defendants; (2) all conference call transcripts produced by Defendants; (3) all analyst reports produced by each of the "analyst" non-parties subpoenaed in this action; (4) all First Call reports available to Lead Plaintiff from November 1999 to April 2000 and March 2001 to March 2002; (5) production documents concerning the AHA and ACC/ABC Vanlev presentations; (6) the entire transcripts from the depositions of the three analysts deposed in the action; (7) the entirety of other relevant deposition transcripts, including that of BMS's Timothy Cost, formerly of its Investor Relations Department; (8) BMS press releases; and (9) analyst reports produced by BMS, including all

---

[14] She agreed that analysts considering Vanlev's risk/benefit profile in 1999 would have explicitly reported the four cases of intubation or tracheotomy had they known they occurred. (PX 27 168:25-169:7.)

reports marked by Defendants at the depositions of the three analysts.  (PX 19, Ex. B.)

Defendants' market expert, Mary Ann Gray, similarly only looked at the documents reviewed by

Mr. Uhl and others selected by counsel for Defendants. (PX 27 157:17-158:7.)

Also like Mary Ann Gray, Mr. Uhl reliably drew on his professional experience for an

understanding of what terms like "intubation," "airway compromise" and "special treatment"

meant. (DX 16 ¶13; PX 27 158:8-23, 161:15-164:17.)

### C.    Mr. Uhl's Opinions Concerning NYSE Listing Requirements

Mr. Uhl's opinions concerning the disclosure obligations set forth in the NYSE Listed

Company Manual are reliable given his application of relevant professional experience and

training to the facts of this case.  This is not the type of opinion that lends itself to a

particularized peer-reviewed "methodology" as argued by Defendants.  See, e.g., Schneider v.

Fried, 320 F.3d 396, 406 (3d Cir. 2003) ("we note that expert testimony does not have to obtain

general acceptance or be subject to peer review to be admitted under Rule 702."  "Where there

are other factors that demonstrate the reliability of the expert's methodology, an expert opinion

should not be excluded simply because there is no literature on point.")  Mr. Uhl reviewed a

variety of documents concerning the unblinded OCTAVE results.  If Defendants believe that Mr.

Uhl overlooked fundamental documents that would justify non-disclosure of the results, they can

cross-examine Mr. Uhl on these issues.  (To date, Defendants have not identified a single

document indicating that the FDA prohibited or discouraged BMS's disclosure of the OCTAVE

results.)

### IV.    Mr. Uhl's Testimony Meets the "Fit" Requirement And Should Be Admitted

In addition to reliability, Rule 702 requires that the expert's testimony must assist the

trier of fact in its determination of the claims and defenses.  Contrary to Defendants' assertions,

Mr. Uhl's testimony clearly fits the facts of this case, would assist the trier of fact, and not usurp its function.  "It is clear that expert testimony must be useful to the finder of fact in understanding the evidence or deciding an issue to be admissible, and that the testimony need not concern information beyond the finder of fact's sphere of knowledge to be helpful. . . ." 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence, 702.03[2][b] at 702-40-41 (2d ed. 2005)(explaining that within the Third Circuit "courts ruling on proffered expert testimony about issues arguably within juror's common knowledge have been characterized as liberally or broadly predisposed towards admission of the evidence.")

### A.     Opinions on Materiality

Mr. Uhl's opinions on the significance of certain information related to OCTAVE and OVERTURE would assist the trier of fact in this action by providing the perspective of the pharmaceutical securities industry and a framework for the impact of disclosures about OCTAVE and OVERTURE.  Understanding how an industry would evaluate certain information, and the value that industry would place on the information, would assist the jury in its determination of that value within the meaning of the securities laws, after instruction by the Court.

Mr. Uhl's opinions about materiality, although using the word "material," use the term in a vernacular manner consistent with industry practices.  Any potential confusion could be remedied with a jury instruction.  4 Weinstein's Federal Evidence, 704.04[2][c].  Defendants' experts have certainly used the words "material" and "immaterial" in their reports and testimony (DX 14 ¶3; 12 ¶13), and in the recent trial of In re WorldCom, Inc. Sec. Litig., No. 02-3288 (SDNY)(DLC), in the United States District Court for the Southern District of New York, experts such as the Lead Plaintiff's damages expert, Blaine Nye, were able to testify about materiality, using the word "material" et cetera.  See, e.g., Pl. Opp. Ex. 18).

**B.     Opinions On Whether Information About the
Incidence or Severity of Vanlev's Angioedema Were
Absorbed By the Marketplace and Reflected in BMS Stock Price**

Mr. Uhl's comprehensive review of thousands of pages of analyst reports, conference call transcripts, audio tapes, and production documents and his determination that the market did not report that there were four intubation events[15] in the initial Vanlev clinical trials or that Vanlev was associated with a higher incidence of angioedema and severe angioedema, but that this is the type of information that would have been reported if it was known given industry practices, would greatly assist the trier of fact and save a considerable amount of time.  His expertise would be relevant to the jury's ability to understand and synthesize the documentary evidence.

**C.     Opinions Concerning the NYSE Listing Requirements**

Mr. Uhl's opinions concerning BMS's deviations from NYSE listing disclosure obligations do "fit" the issues in this action.  Specifically, they are probative of whether Defendants acted recklessly or with conscious misbehavior after they learned of the OCTAVE results and are concrete examples of Defendants' reckless or intentional failure to disclose important information to the market.  See FDIC v. Refco Group, Ltd., 184 F.R.D. 623, 630 (D. Col. 1999).

A plaintiff can show conscious misbehavior by adducing facts that defendants had actual knowledge that their statements were false or misleading at the time they were made. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 238-39 (3d Cir. 2004).  Recklessness can be shown by establishing "defendants' knowledge of facts or access to information contradicting their public statements." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000); In re Nice Sys.,

---

[15] Defendants can point to no public report of any of the intubations, using the word "intubation," "tracheotomy or "cricothyrotomy," before the April 19, 2000 disclosure. (DX 16 ¶13.)

Ltd. Sec. Litig., 135 F. Supp. 2d 551, 585 (D.N.J. 2001) (same).  A reckless statement is "a material misrepresentation or omission involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  GSC Partners, 368 F.3d at 239.  "An egregious refusal to see the obvious, or investigate the doubtful, may in some cases give rise to an inference of recklessness."  In re Nice Sys., 135 F. Supp. 2d at 585.  Mr. Uhl's opinions concerning these alleged failures to disclose would assist a jury in determining Defendants' intentional or recklessness conduct.

Lead Plaintiff does not have to assert a specific claim pursuant to the listing requirements for this proffered testimony to be relevant.  Defendants do not dispute that BMS is subject to the listing requirements.

## CONCLUSION

For the reasons set forth above, Lead Plaintiff respectfully requests that the Court deny Defendants' motion to strike the testimony of Mr. Uhl and that he should be permitted to testify at trial and as part of the summary judgment record.  At a minimum, Mr. Uhl must be allowed to proffer the opinions not challenged by Defendants as Lead Plaintiff has established that Mr. Uhl is qualified to and does render reliable opinions in those areas.

Dated: May 23, 2005

                                        **LITE DEPALMA GREENBERG**
                                        **    & RIVAS, LLC**


                                        By:    /s/Allyn Z. Lite
                                             Allyn Z. Lite (AL-6774)
                                             Joseph J. DePalma (JD-7697)
                                             Michael E. Patunas (MP 2306)
                                        Two Gateway Center
                                        Newark, New Jersey  07102
                                        (973) 623-3000

                                        Liaison Counsel for Plaintiff and the Class

                                        **GOODKIND LABATON RUDOFF**
                                        **    & SUCHAROW LLP**
                                        Thomas A. Dubbs
                                        James W. Johnson
                                        Nicole M. Zeiss
                                        100 Park Avenue
                                        New York, New York  10017
                                        (212) 907-0700

                                        Lead Counsel for Plaintiff and the Class