**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
IN RE BRISTOL-MYERS SQUIBB SECURITIES  :    Civil Action No. 00-1990 (SRC)
LITIGATION                                          :
                                                    :    Return Date: June 6, 2005
                                                    :    Oral Argument Requested
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - -- x


**LEAD PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION**
**TO STRIKE THE EXPERT TESTIMONY OF**
**MICHAEL BARCLAY AND FRANK TORCHIO**


**LITE DEPALMA GREENBERG & RIVAS, LLC**
Allyn Z. Lite (AL 6774)
Joseph J. DePalma (JD 7697)
Two Gateway Center, 12th Floor
Newark, New Jersey  07102
(973) 623-3000

Liaison Counsel for Lead Plaintiff and the Class


**GOODKIND LABATON RUDOFF & SUCHAROW LLP**
Thomas A. Dubbs
James W. Johnson
Nicole M. Zeiss
100 Park Avenue
New York, New York  10017
(212) 907-0700

Lead Counsel for Lead Plaintiff and the Class

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF RELEVANT FACTS ..................................................................... 3

I.  BARCLAY'S OPINIONS ARE ADMISSABLE................................................4

    A.  Defendants Have Admitted That The Market For BMS Stock Was Traded In An "Efficient Market" and Barclay's Analysis Of That Issue Is Reliable ...................................................................................4

        1.  Defendants' Admission In this Case..............................................4

        2.  Barclay's Analysis Of Market Efficiency Is Reliable; To The Extent Defendants Disagree With His Opinion, They May Cross-Examine Barclay At Trial.....................................................6

    B.  Barclay's Event Study Was Endorsed By Defendants' Experts, Is Reliable And Assists In Determining Causation .....................................8

        1.  Defendants Do Not Attack The Methodology Of The Event Study, Which Defendants' Expert Adopted........................................8

        2.  Defendants' Contentions Regarding Barclay's Proximate Cause Conclusions Are Unfounded .................................................8

        3.  Defendants Cannot Base Their Motion To Strike Barclay's Testimony Simply On The Ground That Barclay Does Not Agree With Defendants' Loss Causation Argument .....................................11

        4.  Barclay's Methodology For Analyzing Proximate  Cause In The Second Class Period And His Opinions Have Been Endorsed by Defendants' Own Experts...........................................13

        5.  Defendants' Experts Also Acknowledge That A Portion of The March 20, 2002 Stock Drop Was Attributable to OCTAVE .....................................................................................15

        6.  The Cases Cited by Defendants Are Inapposite ...........................16

        7.  Artificial Inflation Analysis Does Not Require That The Stock Price Rise With Each Of Any Of The Misrepresentations ...........................17

i

C.  Professor Barclay's Allocation of Portions of Artificial Inflation to Misrepresentations Relating to OCTAVE and OVERTURE Is Reliable And Based On Methodology ....................................................................19

1.  The One-Third Decline Due To OCTAVE Is Based On An Expert Methodology .....................................................................19

2.  Defendants Mischaracterize Barclay's Testimony Concerning The One-Third Decline and Its Relation To Artificial Inflation ...................22

3.  Barclay's Implementation of Detsky's Analysis ...........................................24

II.  TORCHIO SHOULD BE PERMITTED TO OFFER TESTIMONY REGARDING AGGREGATE DAMAGES ..................................................................25

A.  The Multi-Trader Model Used By Torchio Is Reliable And Has Been Accepted By Numerous Courts .....................................................25

B.  Torchio's Refusal To Produce His Proprietary Computer Software Is In Accord With Case Law From This District And Is Not Grounds To Strike His Report ................................................................29

C.  Torchio's Application Of The PSLRA's 90-Day Look-Back To The Second Class Period Is Proper; Defendants' Challenges Go To The Weight Of Torchio's Testimony, Not Admissibility ......................................31

D.  Defendants' "Out And In" Argument Has Been Rejected By Other Courts ....................................................................................33

CONCLUSION ....................................................................................... 34

## TABLE OF AUTHORITIES

### CASES

Arista Records, Inc. v. Flea World, Inc.,
  356 F. Supp. 2d 411 (D.N.J. 2005) ......................................................................5

In re Blech Sec. Litig.,
  No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ...............34

In re Bristol-Myers Squibb Co. Sec. Litig.,
  C.A. No. 00-1990 (SRC), (D.N.J. Aug. 30, 2004) ..................................................18

Cammer v. Bloom,
  711 F. Supp. 1264 (D.N.J. 1989) .....................................................................6, 7

In re Cendant Corp. Litig.,
  264 F.3d 201 (3d Cir. 2001.) .........................................................................1, 19

In re Crazy Eddie Sec. Litig.,
  948 F. Supp. 1154 (E.D.N.Y. 1995) ...................................................................33

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579 (1993) .....................................................................8, 13, 25, 26

DeMarco v. Lehman Bros., Inc.,
  222 F.R.D. 243 (S.D.N.Y. 2004) ...............................................................16, 21, 22

EP Medsystems, Inc. v. EchoCath, Inc.,
  235 F.3d 865 (3d Cir. 2000) ...............................................................................12

Elcock v. Kmart Corp.,
  233 F.3d 734 (3d Cir. 2000) ...............................................................................31

In re Executive Telecard Sec. Litig.,
  979 F. Supp. 1021 (S.D.N.Y. 1997) ....................................................................16

Fitz, Inc. v. Ralph Wilson Plastics Co.,
  184 F.R.D. 532 (D.N.J. 1999) ............................................................................31

In re Frontier Ins. Group, Inc. Sec. Litig.,
  94 Civ. 5213(RR)(CLP), slip op. (E.D.N.Y. Sept. 26, 2002) ......................26, 27, 28

Holbrook v. Lykes Bros. Steamship Co.,
  80 F.3d 777 (3d Cir. 1996) ................................................................................29

<u>Kannankeril v. Terminex Int'l, Inc.</u>,
128 F.3d 802 (3d Cir. 1997)......................................................................................33

<u>Kaufman v. Motorola, Inc.</u>,
No. 95 C 1069, 2000 WL 1506892 (N.D. Ill. Sept. 21, 2000)............................26, 28

<u>Magistrini v. One Hour Martinizing Dry Cleaning</u>,
180 F. Supp. 2d 584 (D.N.J. 2002), <u>aff'd</u>,
No. 02-2331, 2003 WL 21467223 (3d Cir. June 25, 2003) ..................................2, 31

<u>Oddi v. Ford Motor Co.</u>,
234 F.3d 136 (3d Cir. 2000)......................................................................................31

<u>Parkinson v. Guidant Corp.</u>,
315 F. Supp. 2d 754 (E.D. Pa. 2004) ......................................................................33

<u>Taylor v. Danek Medical, Inc.</u>,
No. Civ. A. 95-7232, 1999 WL 310647 (E.D. Pa. May 10, 1999) ..........................16

<u>West v. Prudential Sec., Inc.</u>,
282 F.3d 935 (7th Cir. 2002)...............................................................................16, 17

<u>In re WorldCom, Inc. Sec. Litig.</u>,
No. 02 Civ. 3288 (DLC), 2005 WL 375314 (S.D.N.Y. Feb. 17, 2005).............25, 26

## STATUTES

Fed. R. Civ. P. 26(a)(2)(B) .............................................................................................30

Fed. R. Evid. 702 ..........................................................................................................6, 7

Fed. R. Evid. 702, Advisory Committee Notes ................................................................7

## MISCELLANEOUS

B. Cornell, <u>Corporate Valuation: Tools for Effective Appraisal and Decision Making</u>
(Irwin, 1993, Ch. 4)..................................................................................................23

A. Damodaran, <u>The Dark Side of Valuation: Valuing Old Tech, New Tech, and New Economy</u>
<u>Companies</u> (Financial Times Prentice Hall, 2002, Chs. 8-10)............................23, 24

Marcia Kramer Mayer, "Best-Fit Estimation Of Damaged Volume In Shareholder Class Actions:
The Multi-Sector, Multi-Trader Model Of Investor Behavior"
(NERA Oct. 2000) ....................................................................................................28

## PRELIMINARY STATEMENT

Lead Plaintiff, the LongView Collective Investment Fund ("Lead Plaintiff"), and the

Class respectfully submit this memorandum of law in opposition to Defendants' motion to strike

the expert testimony of Professor Michael J. Barclay and Frank Torchio.

At the outset, it is important to note the clear distinction between Barclay's and Torchio's

reports and testimony.  In securities fraud litigation, damages arise when defendants make false

or misleading statements that artificially inflate the stock price.  Artificial inflation is the

difference between the actual stock price and what the true value of the stock would have been

but for the false or misleading information.  In re Cendant Corp. Litig., 264 F.3d 201, 227 (3d

Cir. 2001.)  Barclay's role as an expert was to calculate this inflation per share during the

relevant times.  (PX 12 ¶ 1.)[1]

A second stage in addressing damages in a securities fraud case is to calculate aggregate

out of pocket damages by computing the artificial inflation per share (which in this case was

computed by Barclay) and the total number of shares damaged during the relevant periods.

---

[1]   Lead Plaintiff's expert reports were submitted as exhibits 12-19 to the Declaration of James W. Johnson, Esq. in Opposition to Defendants' Motion for Summary Judgment, dated February 4, 2005.  To the extent any exhibits cited herein were submitted in support of or opposition to Defendants' summary judgment motion, they will be referred to as either "PX" or "DX" and will bear their original summary judgment reference number.  Any new exhibits, which were not submitted either in support of or opposition to Defendants' summary judgment motion, are being submitted herewith as exhibits to the Declaration of James W. Johnson In Opposition to Defendants' Motions To Strike The Expert Testimony of Lead Plaintiff's Expert Witnesses, dated May 23, 2005 ("Johnson Opp. Decl."), and are referred to as "Pl. Opp. Ex. ___."

References to exhibits attached to the Declaration of Elissa Meth in Support of the Motions to Strike the Testimony of Michael J. Barclay, Jonathan L. Benumof, Allan S. Detsky, Robert C. Nelson, Paul D. Stolley, Frank C. Torchio and Robert H. Uhl, dated May 13, 2005, will be referred to as ("Meth Ex.").

Torchio's expert role was to compute this second stage of damages calculations using a multi-trader model.  (PX 18 ¶¶ 1-2.)

This distinction is important because Barclay's "artificial inflation per share" analysis, which he computes on the basis of an extensive 360 page event study, stands on its own regardless of Defendants' opinion of Torchio's multi-trader model.  Defendants submitted a separate motion and memorandum of law for most of Lead Plaintiff's experts.  Defendants undoubtedly combined their discussion of Barclay and Torchio in order to blur the clear distinction between "artificial inflation per share" and "aggregate damages" and to taint the near universal acceptance of the "artificial inflation per share" analysis with the multi-trader model that gives rise to an aggregate damages calculation.

In addition, Defendants have submitted Declarations from two new expert witnesses, René M. Stultz and Maureen O'Hara, in support of their motion to strike the Barclay and Torchio testimony.  (Meth Ex. 11, 12.)  Lead Plaintiff has moved, in a separate cross-motion, to strike these Declarations since it violates the operative scheduling orders in this case and is prohibited by applicable case law.  In Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 590 n. 5 (D.N.J. 2002), aff'd, No. 02-2331, 2003 WL 21467223 (3d Cir. June 25, 2003), plaintiff, without Court approval to amend the operative scheduling order, submitted two additional expert witness affidavits.  The Court granted the motion to strike, noting that "neither expert was named in conjunction with Judge Chesler; July 31, 2000 Order and the Final Pretrial Order was not otherwise amended to permit their testimony for the purposes of the Daubert hearing or for trial."  Id.

In any event, Defendants' need to designate two new experts to challenge Barclay and Torchio arises from the fact that Defendants' previously designated experts agreed with and/or

endorsed many of Barclay's and Torchio's methodology and the fact that the March 20, 2002

stock drop was not attributable to OVERTURE alone.  <u>See</u> Point I(B)(4) and (5), infra.

## STATEMENT OF RELEVANT FACTS

Michael J. Barclay is the Alumni Distinguished Professor of Finance and Finance Area

Coordinator at the University of Rochester's William E. Simon Graduate School of Business

Administration.  He was ranked by Business Week magazine as one of the top 12 business

teachers in the United States and is a seven-time recipient of the Simon School M.B.A. Superior

Teaching Award.  He also has taught at the University of Pennsylvania's Wharton School.  He

received a B.A. (summa cum laude) in Mathematics and Economics from Colgate University and

a Ph. D. in Economics and Finance from Stanford University.  (PX 12 ¶ 7 and Exhibit 1.)

Barclay has published more than 30 articles, notes and comments in the areas of

corporate finance, market microstructure, and the role of largeblock shareholders in public

corporations.  His research has been published in a variety of scholarly journals, including the

Journal of Financial Economics, the Journal of Finance, the Review of Financial Studies, the

Journal of Law and Economics, the Journal of Applied Corporate Finance and the Financial

Analysts' Journal.  He also has served as an advisory editor of the Journal of Financial

Economics, and as an associate editor of the Review of Financial Studies, the Journal of

Financial and Quantitative Analysis, and the Journal of Accounting and Economics.  <u>Id.</u>

Barclay has served as an expert witness in more than 35 cases involving securities

litigation, financial-market operations and antitrust economics.  <u>Id.</u>  In sum, Barclay is qualified

to testify as an expert witness.

Frank Torchio is the President of Finance Economics, Inc.  Since 1989, Torchio has

consulted on issues pertaining to financial valuations, regulatory economics, transfer pricing,

financial-economic analysis and analysis of the response of stock prices to public information in securities fraud lawsuits.  Torchio has been retained by both plaintiffs and defendants in such securities cases.  (PX 18 ¶ 5.)

Torchio holds an MBA in Finance and Economics from the University of Rochester's William E. Simon Graduate School of Business Administration.  He was the 1991 Rosenthal Fellow at the University of Rochester for innovative developments in applying financial-economic theory.  He has served on the adjunct faculties at the William E. Simon Graduate School of Business Administration at the University of Rochester and at the Graduate School of Business at Rochester Institute of Technology.  He has passed the Level III examination of the chartered financial analyst ("CFA") program of the Association for Investment Management and Research and has been awarded the CFA charter.  (Id. ¶ 7.)

Torchio has provided expert testimony on damages in more than 30 securities fraud cases and has co-authored an article about the trading models used for estimating damages in securities fraud cases.  (Id. ¶ 6 and Exhibit A.)  Torchio is also qualified to testify as an expert witness.

I.      **BARCLAY'S OPINIONS ARE ADMISSABLE**

       A.      **Defendants Have Admitted That The Market
             For BMS Stock Was Traded In An "Efficient Market"
             and Barclay's Analysis Of That Issue Is Reliable**

             1.      **Defendants' Admission In this Case**

Defendants filed their Answer To Complaint on April 19, 2001, their Answer To First Amended Consolidated Class Action Complaint on October 21, 2002, and their Amended Answer To First Amended Consolidated Class Action Complaint on November 12, 2002.  *In each Answer, Defendants admitted that the market for BMS stock was efficient at all relevant times.*  All three versions of the Complaint contained the identical allegation, as follows:

>*At all relevant times*, the market for BMS common stock was an efficient market for the following reasons, among others:
>
>>(a)    BMS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;
>
>>(b)    As a regulated issuer, BMS was required to and did file periodic reports with the SEC and the NYSE;
>
>>(c)    BMS regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
>>(d)    BMS was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

Complaint ¶ 22; First Amended Consolidated Class Action Complaint ¶ 25 (emphasis added).

In all three versions of the Answer, Defendants admitted all the averments in this paragraph.  In their Answer to the Complaint, they averred that:  "Admit the averments in paragraph 22, except do not admit any reasons not specifically enumerated."  In their Answer and Amended Answer to the First Amended Consolidated Class Action Complaint, Defendants averred as follows:  "Admit the averments in paragraph 25, except do not admit any reasons not specifically listed in paragraphs 25(a)–(d)."

By their Answer, Defendants have admitted that BMS stock was efficiently traded "at all relevant times."  Defendants made no exception for trading on April 19, 2000 and March 20, 2002, the dates of the corrective disclosures, and cannot create one now.  See, e.g., Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 421 (D.N.J. 2005) (denying defendants leave to amend answer to withdraw admission; "this Court will not allow such amendments to

supersede and replace the original answers in so far as Defendants' new responses contradict or totally omit admissions of fact offered in those prior statements.")[2]

### 2. Barclay's Analysis Of Market Efficiency Is Reliable; To The Extent Defendants Disagree With His Opinion, They May Cross-Examine Barclay At Trial

As an initial matter, Barclay is qualified to testify as an expert witness. He has an extensive background as a financial economist and more than 10 years of experience as a consultant and expert witness in the areas of market efficiency, materiality, causation and damages in securities actions. Barclay has testified as an expert witness in more than 35 cases.

Under Federal Rule of Evidence 702, in order to admit expert testimony, the trial court must first determine that "the testimony is the product of reliable principles and methods" and that "the witness has applied the principles and methods reliably to the case." Fed. R. Evid. 702. This is the case here.

In determining market efficiency, Barclay, in part, considered certain of the five factors delineated in Cammer v. Bloom, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). Defendants' damages expert, Paul Gompers, testified that "[m]any courts have looked at the Cammer factors as a basis for market efficiency." (Pl. Ex. 3 263:13-14.) For example, Barclay researched the significant number of major securities analysts (14 in total) who followed and regularly reported on BMS stock during the class period. (PX 12 ¶ 26.) Barclay also computed that BMS's reported trading volume on the NYSE during the class period was approximately 3.3 billion shares, which represented over 1.6 times BMS's average shares outstanding. (Id. at 27.)

---

[2] Defendants indicate that they intend to "amend their answer upon plaintiffs' filings of their amended complaint to conform their pleadings to the Court's prior orders." Def. Mem. at 17 n.6. The Court has never addressed market efficiency in its prior rulings and Defendants cannot use this ruse to amend their answer on this central issue at this late date in the litigation.

In addition to certain of the <u>Cammer</u> factors, Barclay also reviewed more than 6500 news stories about BMS that appeared in leading financial publications.  Barclay created a chronology from the news articles, which "shows that the BMS common stock price generally reacts quickly to new information, consistent with an efficient market."  (<u>Id.</u> at 25.)  Barclay also conducted a statistical test to determine whether BMS's stock returns exhibited autocorrelation.  Barclay explained that:

> Significant autocorrelation implies a statistical relation between stock returns over consecutive days and could indicate a violation of market efficiency.  As expected in an efficient market, the statistical test I performed shows no significant autocorrelation for BMS' common stock returns.

(<u>Id.</u> at 29 (footnote omitted).)

Based on all these factors, Barclay concluded that BMS's "common stock was traded in an efficient market with regard to publicly-disclosed information during the Class Period."  (<u>Id.</u> at 30.)

In sum, Barclay provided the rationale and basis for his opinions and produced the back-up data to support them.  He applied established criteria in the definition of a "semi-strong efficient market" that have been subject to peer review (PX 12 at 13 n.10) and are quantifiable.  His testimony is thus "grounded in an accepted body of learning or experience in the expert's field," and he explains "how the conclusion is so grounded."  Fed. R. Evid. 702, Advisory Committee Notes.

Defendants' general attack on Barclay's conclusion amounts to a simple disagreement of opinion.  Indeed, Defendants' entire argument on this point (Defs. Mem. at 19-21) is not based on any case law, *but on their own experts' declarations and articles*.  Defendants' "support" graphically highlights that their argument simply is a difference of opinion, which clearly is not a basis to exclude Barclay's testimony.  Where evidence meets the standards of Rule 702,

"[v]igorous cross-examination, presentation of contrary evidence, and careful constriction on the burden of proof are the traditional and appropriate means" of attack.  <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 596 (1993).  Thus, "conventional devices, rather than wholesale exclusions" are "the appropriate safeguards" for this evidence.  <u>Id.</u>

      **B.**      **Barclay's Event Study Was Endorsed**
              **By Defendants' Experts, Is Reliable**
              <u>**And Assists In Determining Causation**</u>

             **1.**      **Defendants Do Not Attack The Methodology Of**
                     <u>**The Event Study, Which Defendants' Expert Adopted**</u>

At the outset, it is important to note that Defendants do not attack the methodology of Barclay's event study.  Indeed, Defendants' damages expert, Bradford Cornell, "relied on" Barclay's event study (Cornell Dep. 161: 5–6) and otherwise endorsed it.  As Cornell testified:

> Q.     Am I correct in understanding that you do not criticize Dr. Barclay's methodology in performing his event study, that is Professor Barclay?
>
> A.     I do not.
>
> Q.     So you don't have any quibble with his methodology, is that right?
>
> A.     I didn't really even address it.  It seemed on the surface to be quite reasonable, and the point that I was making was not a methodological one about how you do an event study, but what the event study showed.  And I didn't want to pollute that point with a dispute about how to do an event study.

(Pl. Ex. 2 161:24-162:14.)

             **2.**      **Defendants' Contentions Regarding Barclay's**
                     <u>**Proximate Cause Conclusions Are Unfounded**</u>

Defendants claim that Barclay's event study does not support his opinion concerning proximate cause.  Defs. Mem. at 22-26.  Defendants primarily base this argument on a gross mischaracterization of Barclay's methodology.  Defendants contend that:

Professor Barclay did, however, find that on the final dates of each class period – April 19, 2000, and March 20, 2002 – the price of BMS stock declined precipitously and in a manner that was statistically significant when compared against the performance of the other, benchmark securities.  (Barclay Report ¶¶ 53, 74.)  Having found that the declines in the value of BMS stock on the two final class period dates were statistically significant, Professor Barclay – *based on only the temporal coincidence of the declines with the disclosures of news relating to Vanlev on those same days* – that those statistically significant drops were causally related to alleged misrepresentations/omissions about Vanlev months earlier.  (Barclay Report ¶¶ 81, 82.)  Professor Barclay reached that conclusion about causation even though on each of the "corrective disclosure" dates, BMS made several material additional disclosures – e.g., the withdrawal of the Vanlev New Drug Application, the results of the OVERTURE trial), that did not supply "corrective" information that BMS is alleged to have misrepresented or omitted earlier.  (See generally Mar. 18, 2005 Reply Mem. in Supp. of Defs. Mot. for Summ. J., at 23-26.)

Defs. Mem. at 5 (emphasis added).

Barclay's opinion concerning the stock price drops on April 19, 2000 and March 20, 2002, as he explicitly stated in his report, is not based on a "temporal coincidence."  Instead, Barclay laid out the stock price drop and the contemporaneous comments by analysts and news sources concerning the stock price drop to arrive at his conclusion.

For example, with respect to the stock price drop on April 19, 2000, Barclay described the actual stock price drop (PX 12 ¶ 53), and then reviewed 46 analysts reports and news articles issued on April 19 and more than 100 analysts reports and news articles issued the following day concerning BMS's April 19, 2000 announcement.  (PX 12 ¶ 54 and Exhibit 7 at 63-68.)  In addition, Barclay reviewed thousands of other analyst's reports and news commentary during the relevant time period.  Following this extensive review, Barclay concluded that:

Based primarily on the large and statistically significant stock-price decline and unusually large trading volume on April 19, 2000, as well as the commentary and analysis of the disclosure by the media and analysts, I conclude that the information disclosed on April 19, 2000 was material to investors.

9

(PX 12 ¶ 55.)

Similarly, Barclay used his exhaustive event study to rule out other factors in determining the inflation per share for the April 19 stock price drop.

> News stories on April 19, 2000 suggest that the stock prices of three companies in the industry index, Merck, Pfizer, and King Pharmaceuticals, increased, in part, because they produced hypertension drugs that were direct competitors of VANLEV. Because of this possibility, I examined news stories, analysts' reports, and intraday stock returns for the remaining companies in the industry index for evidence that the prices of other companies in the index increased for the same reason. I found no evidence to support this conclusion. Thus, to insulate the industry index from effects that are directly related to the VANLEV disclosure, I removed the three companies, Merck, Pfizer and King Pharmaceuticals, from the industry index and recalculated the value of the index on April 19, 2000. Using this adjusted industry index, I calculated the (adjusted) excess return on April 19, 2000 to be -24.69%, and the stock-price decline, net of market and industry effects, to be $16.08. I utilize this smaller adjusted excess price change as a measure of artificial inflation during the first damages period and conclude that the April 19, 2000 Disclosure caused a reduction of the artificial inflation in BMS' common stock equal to $16.08 (see Exhibit 6).

(PX 12 ¶ 81.)

Barclay performed a similar analysis for the Second Class Period. Barclay described the actual stock price drop (PX 12 ¶74), and then explained the results of his review of 81 analyst reports and news articles issued on March 20, 59 additional reports and commentary issued on the following day, and thousands more in the relevant time frame. (PX 12 Exhibit 7 at 307-13.) Based on this review, Barclay concluded that:

> Based primarily on the large and statistically significant stock-price decline and unusually large trading volume on March 20, 2002, as well as the commentary and analysis of the disclosure by the media and analysts, I conclude that the information disclosed on March 20, 2002 was material.

(PX 12 ¶ 76.)

Again, Barclay used his comprehensive event study to rule out other factors in determining the inflation per shares for the March 20 stock price drop.

> BMS' closing stock price on March 20, 2002 was $41.08 per share, down $7.57 per share from its closing price of $48.65 on March 20, 2002.  After adjusting this stock-price change for the effects of market and industry movements, I conclude that the announced results of the OCTAVE and OVERTURE trials caused a reduction in the BMS common stock price equal to the excess stock-price change on March 20, 2002 of $6.69 per share (see Exhibit 6).

(PX 12 ¶ 82.)

Accordingly, Barclay's conclusions with respect to the April 19, 2000 and March 20, 2002 stock drops are not based on "temporal coincidence," but reflect his extensive research and methodology.

### 3.    Defendants Cannot Base Their Motion To Strike Barclay's Testimony Simply On The Ground That Barclay Does Not Agree With Defendants' Loss Causation Argument

Defendants' experts contend that "it was the news of the [NDA] withdrawal, rather than any 'correction' of previously released information about Vanlev's severe angioedema incidence rate, that drove the behavior of BMS stock on" April 19, 2000.  Defs. Mem. at 24.  This is, of course, their own paid experts' exculpatory view of the $33 billion stock price drop (which has no support in the contemporaneous analyst's reports or news commentary).

Defendants contend that Lead Plaintiff cannot establish loss causation for the class period ending on April 19, 2000 (the "First Class Period") because the $33 billion drop in BMS's market capitalization on April 19, 2000 purportedly was not caused by the alleged fraud.  Defs. Mem. at 23-24.  Defendants base this argument on two grounds:  (1) BMS did not specifically disclose the four intubations and tracheotomies in its press release issued on April 19, 2000; and (2) the April 19 press release announced BMS's decision to withdraw the New Drug Application

("NDA") for Vanlev, which defendants characterize as a true statement of a recently known fact.
Id.

      With respect to the first ground, Lead Plaintiff established that the alleged fraud was not
limited to BMS's failure to disclose the four intubations and tracheotomies prior to April 19,
2000, but arose from the fact that Defendants fraudulently withheld from the market information
about the frequency and severity of angioedema that occurred in the Vanlev clinical trials.  Lead
Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion For Summary Judgment
("Pls. S. J. Mem.") at 43 n. 19.  The intubations and tracheotomies were only one component of
the material information that BMS withheld from the market about Vanlev's serious side effects.

      In any event, BMS, in its April 19 corrective disclosure, announced that it was
withdrawing the Vanlev NDA "in response to questions raised recently by the [FDA] regarding
the comparative incidence and severity of an infrequent side effect known as angioedema . . . ."
Accordingly, BMS's April 19 press release constituted a corrective disclosure connected to the
alleged fraud since BMS revealed material facts heretofore unknown by the market – the
incidence and severity of angioedema in the Vanlev clinical trials and the FDA's concern about
the angioedema – that caused the massive stock price decline.  See, e.g., EP Medsystems, Inc. v.
EchoCath, Inc., 235 F.3d 865, 883 (3d Cir. 2000) (causation in securities fraud case defined as a
"sufficient nexus between the loss and the alleged [nondisclosure].")  The evidence here easily
meets this standard.  Pls. S. J. Mem. at 42-43; Lead Plaintiff's Statement Pursuant To Local Rule
56.1 ("Rule 56.1 Statement") at ¶¶ 370-80; (PX 12 ¶¶ 77-81.)

      With respect to the second ground, the April 19 press release, as noted in the prior
paragraph, did not simply announce the withdrawal of the NDA.  The press release announced
the reasons for the withdrawal: the "incidence and severity" of angioedema and the FDA's

concerns about those serious side effects.  Those facts were not known to the market and caused the enormous one-day drop in the price of BMS stock.  Id.

Lead Plaintiff's evidence, consistent with Barclay's event study, establishes that the stock price drop on April 19, 20000 resulted from BMS's corrective disclosure regarding the incidence and severity of angioedema, which was not known to the market and which caused BMS to withdraw the NDA rather than face the FDA's rejection of Vanlev.  To the extent Defendants pursue their loss causation argument, which has no support in contemporaneous analyst's reports, they may cross-examine Barclay at trial.  It simply is not a basis to strike his testimony.  Daubert, 509 U.S. at 596.

> **4.      Barclay's Methodology For Analyzing Proximate**
> **Cause In The Second Class Period And His Opinions**
> **Have Been Endorsed by Defendants' Own Experts**

Defendants also argue that Lead Plaintiff has not established loss causation for the class period ending on March 20, 2002 (the "Second Class Period") because, they claim, the $14.7 billion drop in BMS market capitalization on March 20 was entirely due to OVERTURE, the Vanlev heart failure study, as opposed to OCTAVE, the Vanlev hypertension study.  Defs. Mem. at 22-23.  However, as more fully set forth below: (1) Defendants' own experts disagree with this argument; (2) Defendants' own reports endorsed Barclay's methodology; and (3) Barclay has provided an accepted and reliable methodology for his calculation that one-third of the March 20 stock drop was attributable to OCTAVE.

With respect to the third point, Barclay reported that:

> The release of OCTAVE trial results would have two potential
> effects on the market's expectation for future VANLEV sales.
> First, information about the OCTAVE trial results would have a
> direct effect on the market's expectation for VANLEV sales for the
> treatment of [hypertension].  Second, VANLEV's poor safety
> profile in the OCTAVE trial could "spill over" to reduce VANLEV
> sales for the treatment of [congestive heart failure].  To address

> these two effects, I first calculate the portion of the stock-price
> decline on March 20, 2002 that is attributable to the change in the
> market's expectation for VANLEV sales for the treatment of
> [hypertension].  I then discuss the potential spill-over effects of the
> OCTAVE trial on expected sales of VANLEV for the treatment of
> [congestive heart failure].

(PX 12 ¶ 84.)

Barclay then proceeded to review all analysts' sales forecasts for Vanlev that were issued "immediately before and after the [March 20] disclosure."  (Id. ¶ 96.)  Following this review, Barclay opined that analysts following BMS around the March 20 disclosure fall into one of three groups:  (1) several optimistic analysts had very high expectations for OCTAVE and attributed two-thirds of the decline in their Vanlev sales forecasts to the decline in sales for the treatment of hypertension; (2) most analysts had more guarded expectations for OCTAVE, placed greater emphasis on heart failure treatment, and attributed one-third of the decline in their Vanlev sales forecasts to hypertension; and (3) a few analysts were very pessimistic about the results of OCTAVE and attributed most of the decline in their Vanlev sales forecasts to heart failure.  (PX 12 ¶¶ 85-94.)

Barclay's methodology was explicitly endorsed by Defendants' own damages expert, Bradford Cornell.  Cornell testified that:

> Q.      In doing your computation of the change of present value
> of Vanlev as a result of the withdrawal of the NDA, you used
> analysts' reports to get your revenue numbers, correct?
>
> A.      Yes.
>
> Q.      Okay.  And is this an appropriate methodology for the
> purpose for which you used it?
>
> A.      I think so, yes.
>
> Q.      Professor Barclay used analyst reports to get numbers for
> the basis for his allocation of the market drop between Octave and
> Overture in the second class period.  In terms of methodology, do

you agree that it was correct methodology for Professor Barclay to use analysts' reports as a source of his numbers for calculation of the apportionment of market drop in the second class period?  Just methodology

**

A.      I think the use of analysts' reports for the purposes of getting revenue forecasts and seeing how those changes is reasonable.

Q.      I'm not sure if that answers my questions so I'm going to try and ask  my question again.

Do you think that it was reasonable for Professor Barclay to use analysts' reports for the numbers that he used for analysis of the allocation of the market drop in the second class period?

A.      I think it's reasonable to use analysts' reports and revenue forecasts.

(Pl. Ex. 2 162:15-164:25.)

> ### 5.      Defendants' Experts Also Acknowledge That A Portion of The March 20, 2002 <u>Stock Drop Was Attributable to OCTAVE</u>

Defendants' own experts testified that some portion of the March 20 drop was due to OCTAVE.  When asked "whether the market's negative reaction on March 20, 2002, was in any point or portion caused by the release of the OCTAVE data," Defendants' expert Mary Ann Gray testified, "I can't say absolutely that there was no response" and also that she could not "attribute 100 percent of the stock price drop to OVERTURE."  (PX 27 187-88.)  Similarly, Defendants' damages expert Bradford Cornell stated in his report that the decline in value on March 20, 2002 was only "primarily caused" by OVERTURE rather than OCTAVE.  (DX 12 ¶ 139.)  During his deposition, Cornell testified that he "couldn't rule out" that some of the decline was attributable to OCTAVE and estimated that 10-20% of the decline was caused by OCTAVE.  He explained that Defendants did not ask him to quantify the amount that OCTAVE contributed.  (Pl. Ex. 2 236-38.)

As previously noted, the appropriate response to the dispute is not to strike the expert's report, but allow the trier of fact to assess the weight of the testimony at trial. See, e.g., Taylor v. Danek Medical, Inc., No. Civ. A. 95-7232, 1999 WL 310647, at *2 (E.D. Pa. May 10, 1999) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence").

### 6.   The Cases Cited by Defendants Are Inapposite

The cases cited by Defendants are inapposite. Defendants primarily rely on In re Executive Telecard Sec. Litig., 979 F. Supp. 1021 (S.D.N.Y. 1997), in which the court excluded the testimony of plaintiffs' damages expert in a fraud-on-the-market case. The basis for the Court's opinion was that *the expert failed to conduct an event study* and thereby rule out company-specific factors other than the alleged fraud that might have affected the corporation's stock price. That is not the situation here. Here, Barclay conducted a micro-analysis of each company specific event that could have affected BMS's stock price, methodically charting those events on a daily basis. The result is a 360 page chronology containing a textural summary of each event placed next to the closing price of BMS stock for a three-year period spanning from 1999 to 2002, and including the class periods. (PX 12 at Exhibit 7.) This type of event study is routinely upheld courts.

Defendants improperly and unnecessarily attack Barclay on the basis of West v. Prudential Sec., Inc., 282 F.3d 935 (7th Cir. 2002), and Torchio on the basis of DeMarco v. Lehman Bros., Inc., 222 F.R.D. 243 (S.D.N.Y. 2004).[3]  In West, Judge Easterbrook (and the district court) noted that Barclay was a "reputable financial economist" and a competent expert.

---

[3]   The DeMarco decision is distinguished in Section II(C)(1), infra.

West, 282 F.3d at 938.  Barclay's expert opinion in West *did not involve an event study*.  Instead, Barclay was asked to opine on issues related to class certification in a securities fraud case that did not involve public misrepresentations or omissions of material fact.  In West, the fraud involved non-public information about Jefferson Savings that a stockbroker, James Hofman, disclosed to his clients.  Id. at 936.  As the Court noted, Barclay "started with a model devised by another economist, in which trades themselves convey information to the market and thus affect price."  Id. at 939.  The Court further noted that "[w]hat Barclay did is inquire whether the price of Jefferson Savings stock rose during the period of additional demand by Hofman's customers.  He gave an affirmative answer and stopped."  Id.  By not conducting, in essence, an event study (which is rarely, if ever, used in the class certification context), the court held that "the causal link between Hofman's statements and price has not been made out", and reversed the certification of the class.  Id.  939-40.

Since Barclay performed an exhaustive event study here, the rationale of West is inapplicable.

### 7.    Artificial Inflation Analysis Does Not Require That The Stock Price Rise With Each Of Any Of The Misrepresentations

Defendants also argue that the price declines on April 19, 2000 and March 20, 2002 were not causally related to the misrepresentations and omissions of material fact since Barclay's event study "failed to detect any statistically significant increase (i.e., inflation) in the price of BMS stock" on the dates of those misrepresentations or omissions of material fact.  Defs. Mem. at 24-25.

However, the reasons for this occurrence are obvious.  First, as acknowledged by Paul Gompers, Defendants' own damages expert, the stock price of a company would not react to an omission of material fact.

> Q.    Would you ever expect the stock price of a company to react to an omission of material fact?
>
>                            * * *
>
> A.    I guess in many circumstances it wouldn't – I mean, if there was no other information released and the omission was material, it wouldn't move, potentially.

(Pl. Ex. 3 117:15-22.)

Second, the alleged misrepresentations were, in fact, disseminated to the market long before the commencement of the First Class Period in the fall of 1999.  See, e.g., In re Bristol-Myers Squibb Co. Sec. Litig., C.A. No. 00-1990 (SRC), Opinion at 5-6 (D.N.J. Aug. 30, 2004) (listing numerous misrepresentations issued by Defendants prior to November 1999). Accordingly, the artificial inflation was already present in the stock price by the commencement of the First Class Period.

Third, as Defendants' damages expert, Paul Gompers, acknowledged during his deposition, the stock price need not react to the misstatement of a material fact if that misstatement confirmed investors' prior expectations.  (Pl. Ex. 3 111-14.)

In any event, it is telling that Defendants do not cite a single case in support of their argument that a plaintiff in a securities fraud case must establish an increase in the price of the company stock following the issuance of an alleged misstatement.  There is no such authority. Indeed, the applicable law is directly contrary to Defendants' position.

> [T]he fraudulent statements made by Cendant were not in the form of a surprising announcement that caused the stock to rise a certain amount which would provide a fair indication of how much the fraud affected the price.  Instead, Cendant's fraud consisted of releasing financial statements that met the market's expectations, while the truth was that Cendant was falling far short of these expectations.

In re Cendant Corp. Sec. Litig., 264 F.3d at 227 (affirming settlement).  Defendants are

unilaterally and improperly adding an element to the cause of action that Lead Plaintiff here need

not to prove.

      **C.**    **Professor Barclay's Allocation of Portions of**
                  **Artificial Inflation to Misrepresentations**
                  **Relating to OCTAVE and OVERTURE Is**
                  **Reliable And Based On Methodology**

           **1.**    **The One-Third Decline Due To OCTAVE**
                         **Is Based On An Expert Methodology**

Defendants accuse Barclay of using a "Goldilocks" methodology of determining a

consensus market view of the proportion of VANLEV sales attributable to hypertension, and that

he simply picked a midpoint as the consensus view.  Defs. Mem. at 27 (citing Stulz Declaration

¶ 24, which does not mention fairy tales.)  Further, they state that Barclay "chose not to" offer

any "measure of central tendency" such as a mean or median in the body of his report.  However,

Barclay's report contains ample information to easily compute a measure of central tendency

(PX 12 ¶¶ 82-97), which he said that he calculated before reaching his opinion.  (Meth Ex. 1

171:14-25.)

As previously noted, Barclay began by carefully analyzing each analyst's views

regarding use in hypertension prior to the March 20, 2002 disclosure, categorizing the analysts as

either optimistic, guarded, or having written off hypertension revenues.  Barclay was able to

identify four analysts that provided numerical estimates for the decline in their BMS revenue

projections due to hypertension after the March 2002 disclosure.  Barclay categorized two of

these analysts as optimistic (JPMorgan and CIBC World Markets) and two as guarded (Morgan

Stanley and CSFB).  For the decline in revenue attributable to Vanlev's use in hypertension,

Barclay found that JPMorgan attributed approximately 55% (under conservative assumptions),

CIBC attributed two-thirds, Morgan Stanley (base case) attributed one-third, and CSFB

attributed 30%. Including the two analysts who had written off hypertension from their estimates prior to the disclosure (Bernstein Research and Salomon Smith Barney) as attributing 0% of the revenue decline from Vanlev's use in hypertension, yields an average decline in revenue due to Vanlev's use in hypertension ("HTN") of approximately one-third. (PX 12 ¶¶ 82-97.) Barclay's analysis may be summarized as follows:

| Analyst | View of HTN | HTN Revenue Decline / Total Revenue Decline |
|---|---|---|
| JP Morgan | OPTIMISTIC | 55% |
| CIBC | OPTIMISTIC | 67% |
| Morgan Stanley | GUARDED | 33% |
| CSFB | GUARDED | 30% |
| Bernstein Research | WRITTEN OFF | 0% |
| Salomon Smith Barney | WRITTEN OFF | 0% |
| Average | | 31% |
| Median | | 32% |

For analysts without numeric revenue projections, Barclay categorized one as optimistic and eight as guarded.

| Analyst | View of HTN |
|---|---|
| SG Cowen | OPTIMISTIC |
| A.G. Edwards | GUARDED |
| Bear Stearns | GUARDED |
| Deutsche Bank | GUARDED |
| Goldman Sachs | GUARDED |
| Lehman Brothers | GUARDED |
| Merrill Lynch | GUARDED |
| Prudential Securities | GUARDED |
| UBS Warburg | GUARDED |

Barclay concluded that the quantitative conclusions reached by these analysts supported the allocation of one-third of the price drop from the March 20, 2002 corrective disclosure to the results on OCTAVE. Based on the data available, and on his analysis of other available analyst

reports, Barclay concluded that the market consensus reflected the average view of the analysts of approximately one-third of the decline of revenues for Vanlev due to the March 20, 2002 disclosure as relating to hypertension.  (PX 12 ¶¶ 96-97.)

Defendant's only support for this argument is the decision in DeMarco, a securities fraud case against a research analyst, Michael Stanek, and an underwriter, Lehman Bros., arising from Stanek's strong public recommendations to purchase common stock of a computer software company named RealNetworks, Inc., while Stanek privately recommended to preferred clients that they sell or "short" the stock.  DeMarco, 222 F.R.D. at 245.  In this decision, the court analyzed plaintiffs' motion for class certification and denied that motion on the grounds that "plaintiffs have not met their burden of adducing prima facie evidence sufficient to warrant invocation of the fraud-on-the-market doctrine."  Id. at 249.

In support of the motion, plaintiffs' submitted a report from Torchio, which involved Torchio's analysis of the quantification of the effect on RealNetwork's stock price from a hypothetical sell recommendation by Stanek.  The hypothetical construct was necessary because Stanek never lowered his rating for RealNetworks; accordingly, an event study of the stock price effect from disclosure of a Stanek sell recommendation was impossible.  Id. 248; see also (Pl. Opp. Ex. 10 Exhibit 1 at 1 n. 2.)

The court took issue with Torchio's use of a midpoint range in one component of his analysis of this hypothetical:

> Torchio takes the 5% measure to be the "minimum" impact that Stanek's hypothesized "sell" recommendation would have had on RealNetworks' price.  To calculate the "maximum" impact, he then picks three dates during the class period when the price of RealNetworks' stock, after declining the day before, rebounded after publication of analysts' opinions continuing to recommend its purchase.  The average increase on these three occasions was 15.99%, see Torchio Revised Report ¶¶ 93-96, and Torchio

21

> thereby hypothesizes that the impact of a Stanek "sell"
> recommendation on RealNetworks' stock would be somewhere
> between the minimum of 5% and the maximum of 15.99% -- say,
> at least 10%. Id. at ¶ 6.

Id. at 249.

The court found, among other things, that Torchio's choice of a 10% midpoint between two measures was "based on no methodology whatsoever." Id.[4] Here, however, Barclay was not dealing with a hypothetical situation as Torchio dealt with in DeMarco. Barclay's one-third analysis resulted from his comprehensive event study analysis, and flowed from a review of contemporaneous analyst reports. As previously noted, Defendants' own expert endorsed this methodology. Accordingly, DeMarco has not applicability here.

**2.      Defendants Mischaracterize Barclay's
Testimony Concerning The One-Third
Decline and Its Relation To Artificial Inflation**

Defendants state that Barclay has an error that is "inherent in his direct, dollar-for-dollar equation of a one-third decline in direct cash flows with one-third of the existing artificial inflation." Defs. Mem. at 30. However, Barclay did not opine that the stock price should move in a "dollar for dollar" fashion with declines in revenues, but rather that the movements would be proportional. In his testimony, Barclay discussed relative valuation (or the use of multiples), in which the price is related to another variable such as sales or earnings, and how the stock price would move proportionally to changes in another variable. (Meth Ex. 1 162:10-163:13, 168:6-169:24.) These relationships are not generally one-to-one. For example, if a stock had a price-to-earnings ("PE") multiple of 10, the stock price would move $10 for every $1 change in earnings. The ratios are not 1-for-1 because they encompass both the growth of the relevant

---

[4]   Torchio proposed a response to the court's criticisms, which was marked as an exhibit during this deposition. See (Pl. Opp. Ex. 10 at Exhibit 1.)

variable in the future as well as its risk. For example, according to BMS's 10-K for 1999 (prior to restatement), BMS had earnings per share ("EPS") of approximately $2 per share. With BMS's stock price of approximately $64 per share on December 31, 1999, its PE ratio on that date would be approximately 32. Every dollar of earnings does not translate into $1 of stock price, rather it is larger given the expected growth and required return on investment.

Multiples are a generally accepted method of valuation. See, e.g., B. Cornell, Corporate Valuation: Tools for Effective Appraisal and Decision Making (Irwin, 1993, Chapter 4); and A. Damodaran, The Dark Side of Valuation: Valuing Old Tech, New Tech, and New Economy Companies (Financial Times Prentice Hall, 2002, Chapters 8-10). Firms with similar characteristics should have the same value. Multiples allow comparisons of firm values based on a variety of different variables. Cornell states that: "Hickman and Petry observe that in endorsing the direct comparison approach, the court is relying on the 'Law of One Price.' The law of one price is simply a restatement of the basic principle that similar assets should sell at similar prices. For corporations, the courts interpret the law of one price in terms of ratios. If a comparable company that earns $10 million is worth $100 million, then a target that earns $20 million should be worth $200 million." Id. at 59-60 (footnote omitted).

Cornell and Damodaran both state that revenue is a possible variable to use in multiples analysis. For example, Cornell states that total sales can be a superior variable as it is less volatile and subject to manipulation by management (Cornell, at 70). Damodoran states that revenue multiples are attractive to analysts because revenue cannot be negative (whereas earnings or book values can be negative, leading to an unusable multiple), are more difficult to manipulate than earnings through accounting practices and not as volatile as earnings. Drawbacks for using revenue include ignoring costs and profit margins. Damodoran

23

demonstrates that the Price/Sales multiple is positively related to a firm's net profit margin, dividend payout ratio and growth rate, and negatively related to its required rate of return. Damodaran at 320, 325.

In sum, Barclay's revenue analysis does not imply that stock prices should move dollar-for-dollar with a change in revenue. Instead, the stock price would move in the same proportion given changes in sales. That is, the price movement due to a specific change in sales from hypertension should be equal to the price movement from the same change in sales due to congestive heart failure.

### 3.      Barclay's Implementation of Detsky's Analysis

Lead Plaintiff's expert in pharmocoeconomics, Dr. Allan Detsky, opined that the OCTAVE safety results, by themselves, would have caused a 70 to 90 percent reduction in the sales of Vanlev had the OVERTURE results been positive and had the FDA approved Vanlev for the treatment of congestive heart failure. (PX 14:13-15.)[5] Barclay simply took Detsky's conclusion and calculated its impact on the artificial inflation per share of BMS common stock in the Second Class Period. (PX 12 ¶¶ 98-99.) Defendants seek to strike Barclay's calculations in this regard on the grounds that his testimony is not reliable and is not relevant. Defs. Mem. at 32-33.

Defendants' reliability argument arises from their experts' opinions that the negative stock returns on the disclosure dates are too large to be explained by the drop in revenues or profits from Vanlev alone. However, Barclay apportioned the stock price drop on the second disclosure date (i.e., March 20, 2002) in proportion to the projected revenue declines; his bases

---

[5]   Defendants' attacks on Detsky are fully addressed in Lead Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion To Strike The Expert Testimony Of Allan S. Detsky.

were the well-accepted and reliable valuation methods using multiples (in this case, revenue multiples).  The only assumption that Barclay is making is that the revenue multiple for Vanlev sales in the treatment of hypertension is the same as the revenue multiple for Vanlev sales for the treatment of congestive heart failure.  See Point II(C)(2), supra.

Defendants' argument that Barclay's opinion concerning the OVERTURE results is unreliable or irrelevant also misconstrues differences in opinion for grounds to strike under Daubert.  Lead Plaintiff has proffered evidence to show that BMS's omissions concerning the results of a meeting of the OVERTURE Data Safety Monitoring Board were material, and thereby caused an artificial inflation in BMS's stock price.  Rule 56.1 Statement ¶¶ 493-527, 557.  To the extent Defendants disagree with this evidence, they may cross-examine Barclay and Detsky at trial.  It is not a sufficient basis to strike their testimony.

## II.   TORCHIO SHOULD BE PERMITTED TO OFFER TESTIMONY REGARDING AGGREGATE DAMAGES

### A.   The Multi-Trader Model Used By Torchio Is Reliable And Has Been Accepted By Numerous Courts

As previously noted, Torchio conducted a damages analysis separate and distinct from Barclay's inflation per share analysis.  Torchio computed aggregate damages using an out of pocket measure of damages.  Specifically, he computed aggregate damages based on:  (1) the artificial inflation per share computed by Barclay; and (2) Torchio's calculation of 987,393,061 damaged shares using a multi-trader model.  (PX 18 ¶ 2.)  Torchio, in his expert report, explains the components of his 51 multi-trader model at length.  (PX 18 ¶¶ 19-40.)

Defendants contend that a multi-trader model is neither reliable nor acceptable.  Defs. Mem. at 35.  However, this argument simply is wrong.

Indeed, in In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2005 WL 375314 (S.D.N.Y. Feb. 17, 2005), the largest securities fraud case brought to date, Judge Cote rejected

defendants' Daubert challenges to lead plaintiff's damages expert in that case, Blaine F. Nye,

and his use of a multi-trader model to calculate aggregate damages in that securities fraud case.

The court held that:

> First, [defendant Arthur] Andersen challenges Nye's use of a
> "proportional trading" model to calculate shareholder damages.
> As explained by the Lead Plaintiff, Andersen's description of
> Nye's model fails to capture its complexity.  Moreover, his model
> has survived repeated Daubert challenges in other cases.
> Andersen's motion is denied.

Id. at *4.

In WorldCom, lead plaintiff in that case proceeded to trial against the one defendant,

Arthur Anderson, who had not yet settled.  During the trial, the court permitted Nye to testify

about aggregate damages in the case.  The following is an excerpt from that examination of  Nye

by plaintiff's counsel.

> Q.      You testified earlier that you also opined as to the damages
> suffered by those who purchased WorldCom stock under Section
> 10(b) of the Exchange Act?
>
> A.      Correct.
>
> Q.      And what is your conclusion as to what those damages are?
>
> A.      They were roughly $23 billion.

(Pl. Opp. Ex. 18 1327:24-1328:4.)

Defendants seek to exclude Torchio's testimony on the basis of Kaufman v. Motorola,

Inc., No. 95 C 1069, 2000 WL 1506892 (N.D. Ill. Sept. 21, 2000), in which the district court

found that a single trader model, known as the proportional decay model, did not meet Daubert

standards.  (Id. at *2.)  However, Kaufman has never been cited or adopted by any court in the

Third Circuit.  Indeed, other courts, including WorldCom, have specifically rejected the holding

in Kaufman and upheld testimony on the multi-trader model.  For example, the court in In re

Frontier Ins. Group, Inc. Sec. Litig., 94 Civ. 5213 (RR)(CLP), slip op. (E.D.N.Y. Sept. 26, 2002)

(Pl. Opp. Ex. ___) rejected many of the arguments advanced by defendants here and refused to

exclude the expert testimony of Candace Preston, who employed a multi-trader model to

calculate aggregate damages. Id. at 47. The Court held, in part, that:

> Indeed, the court in RMED Int'l Inc. v. Sloan's
> Supermarkets, Inc. [No. 94 CV 5587, 2000 WL 420548 (S.D.N.Y.
> Apr. 18, 2000),] dismissed the defendants' arguments that
> Preston's methodology is unreliable "junk science," has a high rate
> of error, and has not been generally accepted by the relevant
> scientific community, finding instead that her testimony was
> sufficiently reliable to be admitted under Daubert and Rule 702
> and noting that she "employ[ed] . . . the same level of intellectual
> rigor that characterizes the practice of an expert in the relevant
> field." 2000 WL 420548, at *1 (citing Kumho Tire Co. Ltd. v.
> Carmichael, 526 U.S. at 152). Recognizing that "aggregate
> damages in securities fraud cases are generally incapable of
> mathematical precision," and that "every stock pricing model will
> be subject to some form of statistical criticism or unwanted
> interpretation," the court in RMED Int'l, Inc. v. Sloan's
> Supermarkets, Inc., held that those concerns "go to the weight and
> credibility of her testimony, not its admissibility." Id. at *2 (citing
> Bazemore v. Friday, 478 U.S. 385, 400 (1986)).
>
> Here, unlike in RMED Int'l, Inc. and certain of the other cases
> cited by defendants, the major challenge to Ms. Preston's model
> seems to be the fact that it has never been empirically tested.
> However, as Ms. Preston made clear in her testimony, the inability
> to conduct a satisfactory empirical study of the model stems from
> the very nature of the problem - - namely, trying to predict what
> stock purchasers and traders would have done had there been no
> fraudulent activity in order to compare the impact of the fraud on
> prices. Even defendants' suggestion of using claims filed would
> not, as Ms. Preston explained, present a true picture of reality due
> to the impact of factors such as length of time, difficulty in claims
> processing, etc. As the court in Sir Speedy, Inc. v. L & P
> Graphics, Inc., noted:
>
>> Where a defendant's own misconduct has prevented a more
>> precise computation of damages, "the jury must make a just
>> and reasonable estimate of the damage based on relevant
>> data . . . . In such circumstances 'juries are allowed to act
>> upon probable and inferential, as well as direct and positive
>> proof.'"

> 957 F.2d at 1038 (quoting <u>Bigelow v. RKO Radio Pictures, Inc.</u>,
> 327 U.S. 251, 264 (1946)); <u>see also</u> <u>B.E. & K. Co. v. Will &</u>
> <u>Grundy Counties Bldg. Trades Council</u>, 156 F.3d at 770 (noting
> "where, as here, the uncertainty as to damages stems from the
> defendants' illegal conduct, the defendants should not benefit from
> the uncertainty they created: "speculation has its place in
> estimating damages and doubt should be resolved against the
> wrongdoer").

<u>In re Frontier Ins. Group, Inc. Sec. Litig.</u>, slip op. at 46-47.  (Pl. Opp. Ex. 20.)

Indeed, one of the leading defense-oriented expert firms in the country, National

Economic Research Associates ("NERA"), issued a paper within weeks of the <u>Kaufman</u>

decision.  Marcia Kramer Mayer, "Best-Fit Estimation Of Damaged Volume In Shareholder

Class Actions: The Multi-Sector, Multi-Trader Model Of Investor Behavior" (NERA Oct. 2000);

(Pl. Opp. Ex. 25.)  In this paper, NERA challenged the then "popular single-trader (a.k.a.

'proportional trading' or 'proportional decay') model for estimating damaged volumes,

demonstrating that its assumptions about shareholder behavior are inconsistent with the evidence

and strongly biased."  <u>Id.</u> at 1  (noting that the trading model used by plaintiffs in <u>Kaufman</u> fell

into this category).  NERA then went on to extol the reliability of the multi-trader model, similar

to the one used by Torchio in this case.  NERA stated that such a model "relies much more on

data and less on assumption than the single-trader approach.  The result is an estimate of

damaged volume that is empirically grounded, free of bias and a lot closer to reality."  <u>Id.</u>

NERA "applied this methodology to estimate multi-trader parameters from brokerage

firm data in 12 shareholder class actions."  <u>Id.</u> at 9.  NERA concluded that their model "*is*

amenable to empirical modeling, and that the multi-trader model conforms much more closely to

reality than the single-trader model."  <u>Id.</u> at 10 (emphasis in original).

The trading model Torchio used has been tested against NERA's model in a securities

case involving Safeskin.  (Meth Ex. 7 87) (referring to <u>Stanley v. Safeskin Corp.</u>, No. 99 Civ.

28

0454-BTM (S.D. Cal)).  In that case, as Torchio testified, the number of damaged shares

resulting from Torchio's multi-trader model was with 10% of the number of damaged shares that

resulted from the NERA model for the same time period.  In that case, both Torchio and NERA

produced simultaneous damages reports.  Thus, neither side had the advantage of knowing what

the other's damaged shares would be.  Since NERA works exclusively for defendants in

securities class action, it clearly has no incentive to overestimate damaged shares in its

computation of aggregate damages.

Accordingly, Torchio's multi-trader model is sufficiently reliable and should not be

stricken.  Holbrook v. Lykes Bros. Steamship Co., 80 F.3d 777, 784 (3d Cir. 1996) ("If the

expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently

reliable.")

> **B.    Torchio's Refusal To Produce His Proprietary
> Computer Software Is In Accord With Case Law
> From This District And Is Not Grounds To Strike His Report**

Defendants seek to exclude Torchio's testimony because he "has not produced the

parameter inputs upon which the [trading model] is based and with which his conclusions could

be replicated."  Defs. Mem. at 37.  In fact, Defendants' request was made in a letter sent six

weeks after the Torchio deposition was completed; they demanded that "Torchio produce in

electronic format his trading model and data (including the software necessary to run the model)

so that we may determine whether his results are replicable."  (Meth Ex. 9 at 1.)  Defendants'

argument provides no basis for the relief they seek.

First, one of Defendants' damages experts, Paul Gompers, has replicated Torchio's

trading model.

> Q.    So you did replicate his trading model?
>
> A.    Yes.

29

> Q.      And what did that entail?
>
> A.      It entailed sort of creating a distribution of the propensities
> to trade, estimating sort of at the beginning of -- at the beginning of
> the first class period the number of shares which trade on any
> particular day given the different propensities to trade and which
> shares come in and out of class based on the differential
> propensities to trade based on the parameterized 51 different
> trading -- the different – 51 trading propensities of the 51 different
> types of investors.
>
> Q.      So did you have sufficient information in order to replicate
> his trading model?
>
> A.      We had to make -- again, we had to make some particular
> assumptions based -- he said the propensities were between 1 and
> 1,000. . . .
>
>         my understanding of the way trading models are
> implemented in litigation like this allowed me to do a replication
> of going from 2 to 51 traders.

(Pl. Ex. 3 17:25-18:19, 18:24-19:3.)

Second, production of Torchio's proprietary computer model is not mandated by the Federal Rules of Civil Procedure or case law.  Rule 26 provides that the expert report shall contain "the data or other information considered by the witness in forming the opinions". Fed. R. Civ. P. 26(a)(2)(B).  Torchio explained at length in his report the parameters of his trading model, including the trading volume for BMS stock, his estimate as to float, and intra-day turnover.  (PX 18 ¶¶ 23-32.)  He then provided the number of damaged shares from this multi-trader model, and separately computed the number of retained damage shares during the class period.  (PX 18 ¶¶ 33-39.)  Thus, Torchio has provided more than an ample basis to allow one to comprehend (and replicate) his data and opinion.

In the case cited by Defendants, the courts excluded expert testimony because the expert did not provide a basis for his or her opinion.  See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 607 (D.N.J. 2002) (following "three days of hearing and

hundreds of pages of pre-hearing and post-hearing submissions" the expert "has failed to explain how he valued each piece of evidence, his methodological basis for relying heavily on certain pieces of evidence and his methodological basis for completely discounting others"), aff'd, No. 02-2331, 2003 WL 21467223 (3d Cir. June 25, 2003); Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000) (since expert "conducted no tests and failed to calculate any of the forces on [the driver] or the truck during this accident, he used little, if any, methodology beyond his own intuition"); Elcock v. Kmart Corp., 233 F.3d 734, 747 (3d Cir. 2000) ("because [expert] Copemann never explained his method in rigorous detail, it would have been nearly impossible for Kmart's experts to repeat Copemann's apparently subjective methods").

This case is distinguishable.  Torchio has provided a detailed report that provides a complete statement of his methodology and opinions.  Defendants' expert, Gompers, was able to replicate Torchio's trading model.  Defendants have not established any need for Torchio's proprietary computer model, and obviously have not been prejudiced by its non-production. Accordingly, Defendants' argument must be rejected.  See, e.g., Fitz, Inc. v. Ralph Wilson Plastics Co., 184 F.R.D. 532, 539 (D.N.J. 1999) (denying motion to preclude expert testimony where "disclosure of [expert's] proprietary information . . . will not provide any significant insights into the basis for [the expert's] opinions and conclusions . . .")

### C.   Torchio's Application Of The PSLRA's 90-Day Look-Back To The Second Class Period Is Proper; Defendants' Challenges Go To The Weight Of Torchio's Testimony, Not Admissibility

Defendants seek to strike Torchio's report on the ground that he applied the PSLRA's 90 day look back requirement to the disclosure issued by BMS on March 20, 2002 but did not also apply it to the disclosure issued by BMS on April 19, 2000.  Defs. Mem. at 38-40.  Contrary to

Defendants' unsubstantiated statement that Torchio did not "provide any coherent justification for his failure to apply the rule," he testified that:

> Q.      In this case did you apply a 90-day look-back limitation to the end of the first – and I'll use the phrase damages period just because that's the phrase used in the complaint?  In other words, did you apply a 90-day look-back limitation beginning on April 19th, 2000?
>
> A.      No.  I, as I think is stated in the report, looked at this as one class and that the disclosure on April 18th is a partial corrective disclosure, and that the ultimate final disclosure occurred in March of '02.
>
>          And this is a – this is something that I have tried to research to see whether there's been any definitive interpretation of how or when one should apply a look-back provision for a partial corrective disclosure, and I have not in my research have found any definitive conclusion one way or the other, and so I applied it only to the end of the period, the end of the entire class.

(Meth Ex. 7 141:13-142:8.)

Torchio further testified that the 90-day look-back is "not an economic question" but [i]t's really a legal question" to be determined by the Court.  (Meth Ex. 7 146:4-14, 145:8-21.) Indeed, there has been no ruling by this Court that the 90 day look back must be applied to the April 19, 2000 stock drop.  The fact that the Court upheld as actionable misrepresentations two statements made by Defendants within 90 days of the April 19 stock drop (see Opinion entered on August 30, 2004 at 43, upholding statements ¶¶ 10 and 12, which were made on July 17 and 20, 2000) strongly suggests that the April 19 disclosure was only a partial disclosure and that the 90 day lock back should not apply to that disclosure.

In any event, should the Court rule at some point that the 90 day look back applies to the April 19, 2000 stock drop, Torchio simply may recompute the aggregate damages to reflect this ruling.  Such a ruling does not alter the methodology of his underlying multi-trader model; it simply resets an input to that methodology.  As such, the issue "more appropriately go[es] to the

32

weight of [the expert's] testimony as opposed to its admissibility . . . .These are questions for the jury, not for the court in assuming the admissibility of the testimony." <u>Parkinson v. Guidant Corp.</u>, 315 F. Supp. 2d 754, 757 (E.D. Pa. 2004).

Similarly, Defendants argue that Torchio should have reset the float – the number of shares available to be traded – in calculating damages associated with shares purchased during the Second Class Period.  Defendants argue that:

> Mr. Torchio should have used the float figures from that period alone.  Those float figures afford a better, more appropriate basis for prediction of the likelihood of those shares during that period than float figures from a different, prior period.

Defs. Mem. at 41.

Again, Defendants' alternative theory as to float does not invalidate Torchio's stated assumption regarding the float; it simply is a difference of opinion that is the subject of cross-examination.  As the Third Circuit has held:  "<u>Daubert</u> does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology.  Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." <u>Kannankeril v. Terminex Int'l, Inc.</u>, 128 F.3d 802 (3d Cir. 1997) (vacating and remanding summary judgment based on holding that proffered expert testimony on causation was improperly excluded for lack of factual foundation).

**D.    Defendants' "Out And In" Argument**
**Has Been Rejected By Other Courts**

Defendants argue that Torchio's damage calculations are overstated because he failed to account for "out and in" traders, or purchasers of BMS stock who sold their shares within a single period of artificial inflation.  This very argument has been rejected by numerous courts,

for the reasons set forth in the seminal case of <u>In re Crazy Eddie Sec. Litig.</u>, 948 F. Supp. 1154

(E.D.N.Y. 1995).

> While such an off-set may be appropriate for purposes of
> sentencing in a criminal case, [defendant] presents no reason why
> he is entitled to this off-set here, let alone why a perpetrator of
> securities fraud would generally have any off-set against the class
> merely because there were some purchasers fortunate enough not
> to have been injured.
>
> This is the case because the investor is injured at the time of the
> purchase of a security at an artificially inflated price. *Affiliated
> Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) ("[T]he
> correct measure of damages under § 28 of the [Exchange] Act, 15
> U.S.C. § 78bb(a), is the difference between the fair value of all that
> the . . . seller received and the fair value of what he would have
> received had there been no fraudulent conduct.")

<u>Id.</u> at 1172.  <u>See also</u> <u>In re Blech Sec. Litig.</u>, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *26

(S.D.N.Y. Mar. 26, 2003) (same.)

## <u>CONCLUSION</u>

For the reasons more fully set forth above, Lead Plaintiff respectfully requests that the

Court deny Defendants' Motion to Strike The Expert Testimony of Michael Barclay And Frank

Torchio in its entirety.

Dated:  May 23, 2005

LITE DEPALMA GREENBERG
& RIVAS, LLC


By:_____/s/ Allyn Z. Lite_____
        Allyn Z. Lite (AL-6774)
        Joseph J. DePalma (JD-7697)
Two Gateway Center
Newark, New Jersey  07102
(973) 623-3000

Liaison Counsel for Lead Plaintiff
    and the Class

GOODKIND LABATON RUDOFF
    & SUCHAROW LLP
Thomas A. Dubbs
James W. Johnson
Nicole M. Zeiss
100 Park Avenue
New York, New York  10017
(212) 907-0700

Lead Counsel for Lead Plaintiff
    and the Class